PLAUT ET AL. *v.* SPENDTHRIFT FARM, INC., ET AL.

No. 93–1121.   Argued November 30, 1994—Decided April 18, 1995

212

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, and THOMAS, JJ., joined. BREYER, J., filed an opinion concurring in the judgment, *post*, p. 240. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post*, p. 246.

*William W. Allen* argued the cause for petitioners. With him on the briefs was *J. Montjoy Trimble.*

*Michael R. Dreeben* argued the cause for the United States urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Barbara C. Biddle, Simon M. Lorne, Paul Gonson,* and *Jacob H. Stillman.*

*Theodore B. Olson* argued the cause for respondents. With him on the briefs were *Larry L. Simms, Theodore J. Boutrous, Jr., John K. Bush, D. Jarrett Arp, Barbara B. Edelman, Barry Friedman, James E. Burns, Jr., Kevin Muck, William E. Johnson, Robert M. Watt III, Robert S. Miller,* and *L. Clifford Craig.*\*

JUSTICE SCALIA delivered the opinion of the Court.

The question presented in this case is whether § 27A(b) of the Securities Exchange Act of 1934, to the extent that it requires federal courts to reopen final judgments in private civil actions under § 10(b) of the Act, contravenes the Constitution's separation of powers or the Due Process Clause of the Fifth Amendment.

I

In 1987, petitioners brought a civil action against respondents in the United States District Court for the Eastern District of Kentucky. The complaint alleged that in 1983 and 1984 respondents had committed fraud and deceit in the sale of stock in violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission. The case was mired in pretrial proceedings in the District Court until June 20, 1991, when we decided *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350. *Lampf* held that "[l]itigation instituted pursuant to § 10(b) and Rule 10b–5 . . . must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Id.*, at

<hr>

\*Briefs of *amici curiae* urging reversal were filed for the National Association of Securities and Commercial Law Attorneys by *James M. Finberg* and *Paul J. Mishkin;* for the Pacific Mutual Life Insurance Co. by *Richard G. Taranto, H. Bartow Farr III,* and *Stewart M. Weltman;* and for *Michael B. Dashjian,* pro se.

*Joseph E. Schmitz, Zachary D. Fasman, Judith Richards Hope, Charles A. Shanor, Daniel J. Popeo,* and *Paul D. Kamenar* filed a brief for the Washington Legal Foundation as *amicus curiae* urging affirmance.

364. We applied that holding to the plaintiff-respondents in *Lampf* itself, found their suit untimely, and reinstated a summary judgment previously entered in favor of the defendant-petitioners. *Ibid.* On the same day we decided *James B. Beam Distilling Co.* v. *Georgia,* 501 U. S. 529 (1991), in which a majority of the Court held, albeit in different opinions, that a new rule of federal law that is applied to the parties in the case announcing the rule must be applied as well to all cases pending on direct review. See *Harper* v. *Virginia Dept. of Taxation,* 509 U. S. 86, 92 (1993). The joint effect of *Lampf* and *Beam* was to mandate application of the 1-year/3-year limitations period to petitioners' suit. The District Court, finding that petitioners' claims were untimely under the *Lampf* rule, dismissed their action with prejudice on August 13, 1991. Petitioners filed no appeal; the judgment accordingly became final 30 days later. See 28 U. S. C. § 2107(a) (1988 ed., Supp. V); *Griffith* v. *Kentucky,* 479 U. S. 314, 321, n. 6 (1987).

On December 19, 1991, the President signed the Federal Deposit Insurance Corporation Improvement Act of 1991, 105 Stat. 2236. Section 476 of the Act—a section that had nothing to do with FDIC improvements—became § 27A of the Securities Exchange Act of 1934, and was later codified as 15 U. S. C. § 78aa–1 (1988 ed., Supp. V). It provides:

> "(a) Effect on pending causes of action
>
> "The limitation period for any private civil action implied under section 78j(b) of this title [§ 10(b) of the Securities Exchange Act of 1934] that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.
>
> "(b) Effect on dismissed causes of action
>
> "Any private civil action implied under section 78j(b) of this title that was commenced on or before June 19, 1991—

"(1) which was dismissed as time barred subsequent to June 19, 1991, and

"(2) which would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991,

"shall be reinstated on motion by the plaintiff not later than 60 days after December 19, 1991."

On February 11, 1992, petitioners returned to the District Court and filed a motion to reinstate the action previously dismissed with prejudice. The District Court found that the conditions set out in §§ 27A(b)(1) and (2) were met, so that petitioners' motion was required to be granted by the terms of the statute. It nonetheless denied the motion, agreeing with respondents that § 27A(b) is unconstitutional. Memorandum Opinion and Order, Civ. Action No. 87–438 (ED Ky., Apr. 13, 1992). The United States Court of Appeals for the Sixth Circuit affirmed. 1 F. 3d 1487 (1993). We granted certiorari. 511 U. S. 1141 (1994).[1]

## II

Respondents bravely contend that § 27A(b) does not require federal courts to reopen final judgments, arguing first that the reference to "the laws applicable in the jurisdiction . . . as such laws existed on June 19, 1991" (the day before *Lampf* was decided) may reasonably be construed to refer precisely to the limitations period provided in *Lampf* itself, in which case petitioners' action was time barred even under

---

[1] Last Term this Court affirmed, by an equally divided vote, a judgment of the United States Court of Appeals for the Fifth Circuit that held § 27A(b) constitutional. *Morgan Stanley & Co.* v. *Pacific Mut. Life Ins. Co.*, 511 U. S. 658 (1994) *(per curiam).* That ruling of course lacks precedential weight. *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 73, n. 8 (1977).

§ 27A.[2]  It is true that "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers* v. *Roadway Express, Inc.*, 511 U. S. 298, 312–313 (1994); see also *id.*, at 313, n. 12.  But respondents' argument confuses the question of what the law *in fact* was on June 19, 1991, with the distinct question of what § 27A *means* by its *reference* to what the law was.  We think it entirely clear that it does not mean the law enunciated in *Lampf,* for two independent reasons.  First, *Lampf* provides a uniform, national statute of limitations (instead of using the applicable state limitations period, as lower federal courts had previously done.  See *Lampf,* 501 U. S., at 354, and n. 1).  If the statute referred to *that* law, its reference to the "laws applicable *in the jurisdiction*" (emphasis added) would be quite inexplicable.  Second, if the statute refers to the law enunciated in *Lampf,* it is utterly without effect, a result to be avoided if possible.  *American Nat. Red Cross* v. *S. G.,* 505 U. S. 247, 263–264 (1992); see 2A N. Singer, Sutherland on Statutory Construction § 46.06 (Sands rev. 4th ed. 1984).  It would say, in subsection (a), that the limitations period is what the Supreme Court has held to be the limitations period; and in subsection (b), that suits dismissed as untimely under *Lampf* which were timely under *Lampf* (a null set) shall be reinstated.  To avoid a constitutional question by holding that Congress enacted, and the President approved, a blank sheet of paper would indeed constitute "disingenuous evasion." *George Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933).

---

[2] Since respondents' reading of the statute would avoid a constitutional question of undoubted gravity, we think it prudent to entertain the argument even though respondents did not make it in the Sixth Circuit.  Of course the Sixth Circuit did *decide* (against respondents) the point to which the argument was directed.  See 1 F. 3d 1487, 1490 (1993) ("The statute's language is plain and unambiguous. . . . [It] commands the Federal courts to reinstate cases which those courts have dismissed").

As an alternative reason why § 27A(b) does not require the reopening of final judgments, respondents suggest that the subsection applies only to cases still pending in the federal courts when § 27A was enacted. This has only half the defect of the first argument, for it makes only half of § 27A purposeless—§ 27A(b). There is no need to "reinstate" actions that are still pending; § 27A(a) (the new statute of limitations) could and would be applied by the courts of appeals. On respondents' reading, the only consequence of § 27A(b) would be the negligible one of permitting the plaintiff in the pending appeal from a statute-of-limitations dismissal to return *immediately* to the district court, instead of waiting for the court of appeals' reversal. To enable § 27A(b) to achieve such an insignificant consequence, one must disregard the language of the provision, which refers generally to suits "dismissed as time barred." It is perhaps arguable that this does *not* include suits that are not yet *finally* dismissed, *i. e.*, suits still pending on appeal; but there is *no* basis for the contention that it includes *only* those. In short, there is no reasonable construction on which § 27A(b) does not require federal courts to reopen final judgments in suits dismissed with prejudice by virtue of *Lampf.*

### III

Respondents submit that § 27A(b) violates both the separation of powers and the Due Process Clause of the Fifth Amendment.[3] Because the latter submission, if correct, might dictate a similar result in a challenge to state legislation under the Fourteenth Amendment, the former is the narrower ground for adjudication of the constitutional questions in the case, and we therefore consider it first. *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring). We conclude that in § 27A(b) Congress has exceeded its authority by requiring the federal courts to exercise

---

[3] "No person shall be . . . deprived of life, liberty, or property, without due process of law." U. S. Const., Amdt. 5.

"[t]he judicial Power of the United States," U. S. Const., Art. III, § 1, in a manner repugnant to the text, structure, and traditions of Article III.

Our decisions to date have identified two types of legislation that require federal courts to exercise the judicial power in a manner that Article III forbids. The first appears in *United States* v. *Klein*, 13 Wall. 128 (1872), where we refused to give effect to a statute that was said "[to] prescribe rules of decision to the Judicial Department of the government in cases pending before it." *Id.*, at 146. Whatever the precise scope of *Klein*, however, later decisions have made clear that its prohibition does not take hold when Congress "amend[s] applicable law." *Robertson* v. *Seattle Audubon Soc.*, 503 U. S. 429, 441 (1992). Section 27A(b) indisputably does set out substantive legal standards for the Judiciary to apply, and in that sense changes the law (even if solely retroactively). The second type of unconstitutional restriction upon the exercise of judicial power identified by past cases is exemplified by *Hayburn's Case*, 2 Dall. 409 (1792), which stands for the principle that Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch. See, *e. g., Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103 (1948). Yet under any application of § 27A(b) only courts are involved; no officials of other departments sit in direct review of their decisions. Section 27A(b) therefore offends neither of these previously established prohibitions.

We think, however, that § 27A(b) offends a postulate of Article III just as deeply rooted in our law as those we have mentioned. Article III establishes a "judicial department" with the "province and duty . . . to say what the law is" in particular cases and controversies. *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). The record of history shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to *de-*

*cide* them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that "a judgment conclusively resolves the case" because "a 'judicial Power' is one to render dispositive judgments." Easterbrook, Presidential Review, 40 Case W. Res. L. Rev. 905, 926 (1990). By retroactively commanding the federal courts to reopen final judgments, Congress has violated this fundamental principle.

A

The Framers of our Constitution lived among the ruins of a system of intermingled legislative and judicial powers, which had been prevalent in the colonies long before the Revolution, and which after the Revolution had produced factional strife and partisan oppression. In the 17th and 18th centuries colonial assemblies and legislatures functioned as courts of equity of last resort, hearing original actions or providing appellate review of judicial judgments. G. Wood, The Creation of the American Republic 1776–1787, pp. 154–155 (1969). Often, however, they chose to correct the judicial process through special bills or other enacted legislation. It was common for such legislation not to prescribe a resolution of the dispute, but rather simply to set aside the judgment and order a new trial or appeal. M. Clarke, Parliamentary Privilege in the American Colonies 49–51 (1943). See, *e. g.*, Judicial Action by the Provincial Legislature of Massachusetts, 15 Harv. L. Rev. 208 (1902) (collecting documents from 1708–1709); 5 Laws of New Hampshire, Including Public and Private Acts, Resolves, Votes, Etc., 1784–1792 (Metcalf ed. 1916). Thus, as described in our discussion of *Hayburn's Case, supra,* at 218, such legislation bears not on the problem of interbranch review but on the problem of finality of judicial judgments.

The vigorous, indeed often radical, populism of the revolutionary legislatures and assemblies increased the frequency of legislative correction of judgments. Wood, *supra,* at 155–156, 407–408. See also *INS* v. *Chadha,* 462 U. S. 919, 961

(1983) (Powell, J., concurring). "The period 1780–1787 . . . was a period of 'constitutional reaction'" to these developments, "which . . . leaped suddenly to its climax in the Philadelphia Convention." E. Corwin, The Doctrine of Judicial Review 37 (1914). Voices from many quarters, official as well as private, decried the increasing legislative interference with the private-law judgments of the courts. In 1786, the Vermont Council of Censors issued an "Address of the Council of Censors to the Freemen of the State of Vermont" to fulfill the council's duty, under the State Constitution of 1784, to report to the people "'whether the legislative and executive branches of government have assumed to themselves, or exercised, other or greater powers than they are entitled to by the Constitution.'" Vermont State Papers 1779–1786, pp. 531, 533 (Slade ed. 1823). A principal method of usurpation identified by the censors was "[t]he instances . . . of judgments being vacated by legislative acts." *Id.*, at 540. The council delivered an opinion

> "that the General Assembly, in all the instances where they have vacated judgments, recovered in due course of law, (except where the particular circumstances of the case evidently made it necessary to grant a new trial) have exercised a power not delegated, or intended to be delegated, to them, by the Constitution. . . . It supercedes the necessity of any other law than the pleasure of the Assembly, and of any other court than themselves: for it is an imposition on the suitor, to give him the trouble of obtaining, after several expensive trials, a final judgment agreeably to the known established laws of the land; if the Legislature, by a sovereign act, can interfere, reverse the judgment, and decree in such manner, as they, unfettered by rules, shall think proper." *Ibid.*

So too, the famous report of the Pennsylvania Council of Censors in 1784 detailed the abuses of legislative interference with the courts at the behest of private interests and

factions. As the General Assembly had (they wrote) made a custom of "extending their deliberations to the cases of individuals," the people had "been taught to consider an application to the legislature, as a shorter and more certain mode of obtaining relief from hardships and losses, than the usual process of law." The censors noted that because "favour and partiality have, from the nature of public bodies of men, predominated in the distribution of this relief . . . [t]hese dangerous procedures have been too often recurred to, since the revolution." Report of the Committee of the Council of Censors 6 (Bailey ed. 1784).

This sense of a sharp necessity to separate the legislative from the judicial power, prompted by the crescendo of legislative interference with private judgments of the courts, triumphed among the Framers of the new Federal Constitution. See Corwin, The Progress of Constitutional Theory Between the Declaration of Independence and the Meeting of the Philadelphia Convention, 30 Am. Hist. Rev. 511, 514–517 (1925). The Convention made the critical decision to establish a judicial department independent of the Legislative Branch by providing that "the judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Before and during the debates on ratification, Madison, Jefferson, and Hamilton each wrote of the factional disorders and disarray that the system of legislative equity had produced in the years before the framing; and each thought that the separation of the legislative from the judicial power in the new Constitution would cure them. Madison's Federalist No. 48, the famous description of the process by which "[t]he legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex," referred to the report of the Pennsylvania Council of Censors to show that in that State "cases belonging to the judiciary department [had been] frequently drawn within legislative cognizance and determination." The Fed-

eralist No. 48, pp. 333, 337 (J. Cooke ed. 1961). Madison relied as well on Jefferson's Notes on the State of Virginia, which mentioned, as one example of the dangerous concentration of governmental powers into the hands of the legislature, that "the Legislature . . . in many instances decided rights which should have been left to judiciary controversy." *Id.*, at 336 (emphasis deleted).[4]

If the need for separation of legislative from judicial power was plain, the principal effect to be accomplished by that separation was even plainer. As Hamilton wrote in his exegesis of Article III, § 1, in The Federalist No. 81:

> "It is not true . . . that the parliament of Great Britain, or the legislatures of the particular states, can rectify the exceptionable decisions of their respective courts, in any other sense than might be done by a future legislature of the United States. The theory neither of the British, nor the state constitutions, authorises the revisal of a judicial sentence, by a legislative act. . . . A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases." The Federalist No. 81, p. 545 (J. Cooke ed. 1961).

The essential balance created by this allocation of authority was a simple one. The Legislature would be possessed of power to "prescrib[e] the rules by which the duties and rights of every citizen are to be regulated," but the power of "[t]he interpretation of the laws" would be "the proper and peculiar province of the courts." *Id.*, No. 78, at 523, 525.

---

[4] Read in the abstract these public pronouncements might be taken, as the Solicitor General does take them, see Brief for United States 28–30, to disapprove only the practice of having the legislature itself sit as a court of original or appellate jurisdiction. But against the backdrop of history, that reading is untenable. Many, perhaps a plurality, of the instances of legislative equity in the period before the framing simply involved duly enacted laws that nullified judgments so that new trials or judicial rulings on the merits could take place. See *supra*, at 219.

See also Corwin, The Doctrine of Judicial Review, at 42. The Judiciary would be, "from the nature of its functions, . . . the [department] least dangerous to the political rights of the constitution," not because its acts were subject to legislative correction, but because the binding effect of its acts was limited to particular cases and controversies. Thus, "though individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter: . . . so long as the judiciary remains truly distinct from both the legislative and executive." The Federalist No. 78, at 522, 523.

Judicial decisions in the period immediately after ratification of the Constitution confirm the understanding that it forbade interference with the final judgments of courts. In *Calder* v. *Bull*, 3 Dall. 386 (1798), the Legislature of Connecticut had enacted a statute that set aside the final judgment of a state court in a civil case. Although the issue before this Court was the construction of the *Ex Post Facto* Clause, Art. I, § 10, Justice Iredell (a leading Federalist who had guided the Constitution to ratification in North Carolina) noted that

> "the Legislature of [Connecticut] has been in the uniform, uninterrupted, habit of exercising a general superintending power over its courts of law, by granting new trials. It may, indeed, appear strange to some of us, that in any form, there should exist a power to grant, with respect to suits depending or adjudged, new rights of trial, new privileges of proceeding, not previously recognized and regulated by positive institutions . . . . The power . . . is judicial in its nature; and whenever it is exercised, as in the present instance, it is an exercise of judicial, not of legislative, authority." *Id.*, at 398.

The state courts of the era showed a similar understanding of the separation of powers, in decisions that drew little distinction between the federal and state constitutions. To

choose one representative example from a multitude: In *Bates* v. *Kimball*, 2 Chipman 77 (Vt. 1824), a special Act of the Vermont Legislature authorized a party to appeal from the judgment of a court even though, under the general law, the time for appeal had expired. The court, noting that the unappealed judgment had become final, set itself the question "Have the Legislature power to vacate or annul an existing judgment between party and party?" *Id.*, at 83. The answer was emphatic: "The necessity of a distinct and separate existence of the three great departments of government . . . had been proclaimed and enforced by . . . Blackstone, Jefferson and Madison," and had been "sanctioned by the people of the United States, by being adopted in terms more or less explicit, into all their written constitutions." *Id.*, at 84. The power to annul a final judgment, the court held (citing *Hayburn's Case*, 2 Dall., at 410), was "an assumption of Judicial power," and therefore forbidden. *Bates* v. *Kimball, supra*, at 90. For other examples, see *Merrill* v. *Sherburne*, 1 N. H. 199 (1818) (legislature may not vacate a final judgment and grant a new trial); *Lewis* v. *Webb*, 3 Greenleaf 299 (Me. 1825) (same); T. Cooley, Constitutional Limitations 95–96 (1868) (collecting cases); J. Sutherland, Statutory Construction 18–19 (J. Lewis ed. 1904) (same).

By the middle of the 19th century, the constitutional equilibrium created by the separation of the legislative power to make general law from the judicial power to apply that law in particular cases was so well understood and accepted that it could survive even *Dred Scott* v. *Sandford*, 19 How. 393 (1857). In his First Inaugural Address, President Lincoln explained why the political branches could not, and need not, interfere with even that infamous judgment:

> "I do not forget the position assumed by some, that constitutional questions are to be decided by the Supreme Court; nor do I deny that such decisions must be binding in any case, upon the parties to a suit, as to the object of that suit . . . . And while it is obviously possible that

such decision may be erroneous in any given case, still the evil effect following it, being limited to that particular case, with the chance that it may be over-ruled, and never become a precedent for other cases, can better be borne than could the evils of a different practice." 4 R. Basler, The Collected Works of Abraham Lincoln 268 (1953) (First Inaugural Address 1861).

And the great constitutional scholar Thomas Cooley addressed precisely the question before us in his 1868 treatise:

"If the legislature cannot thus indirectly control the action of the courts, by requiring of them a construction of the law according to its own views, it is very plain it cannot do so directly, by setting aside their judgments, compelling them to grant new trials, ordering the discharge of offenders, or directing what particular steps shall be taken in the progress of a judicial inquiry." Cooley, *supra*, at 94–95.

### B

Section 27A(b) effects a clear violation of the separation-of-powers principle we have just discussed. It is, of course, retroactive legislation, that is, legislation that prescribes what the law *was* at an earlier time, when the act whose effect is controlled by the legislation occurred—in this case, the filing of the initial Rule 10b–5 action in the District Court. When retroactive legislation requires its own application in a case already finally adjudicated, it does no more and no less than "reverse a determination once made, in a particular case." The Federalist No. 81, at 545. Our decisions stemming from *Hayburn's Case*—although their precise holdings are not strictly applicable here, see *supra*, at 218—have uniformly provided fair warning that such an act exceeds the powers of Congress. See, *e. g., Chicago & Southern Air Lines, Inc.*, 333 U. S., at 113 ("Judgments within the powers vested in courts by the Judiciary Article

of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government"); *United States* v. *O'Grady,* 22 Wall. 641, 647–648 (1875) ("Judicial jurisdiction implies the power to hear and determine a cause, and . . . Congress cannot subject the judgments of the Supreme Court to the re-examination and revision of any other tribunal"); *Gordon* v. *United States,* 117 U. S. Appx. 697, 700–704 (1864) (opinion of Taney, C. J.) (judgments of Article III courts are "final and conclusive upon the rights of the parties"); *Hayburn's Case,* 2 Dall., at 411 (opinion of Wilson and Blair, JJ., and Peters, D. J.) ("[R]evision and control" of Article III judgments is "radically inconsistent with the independence of that judicial power which is vested in the courts"); *id.,* at 413 (opinion of Iredell, J., and Sitgreaves, D. J.) ("[N]o decision of any court of the United States can, under any circumstances, . . . be liable to a revision, or even suspension, by the [l]egislature itself, in whom no judicial power of any kind appears to be vested"). See also *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421, 431 (1856) ("[I]t is urged, that the act of congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby . . . . This, as a general proposition, is certainly not to be denied, especially as it respects adjudication upon the private rights of parties. When they have passed into judgment the right becomes absolute, and it is the duty of the court to enforce it"). Today those clear statements must either be honored, or else proved false.

It is true, as petitioners contend, that Congress can always revise the judgments of Article III courts in one sense: When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly. See *United States* v. *Schooner Peggy,* 1 Cranch 103 (1801); *Landgraf* v. *USI Film Products,* 511 U. S. 244, 273–280 (1994). Since that is

so, petitioners argue, federal courts must apply the "new" law created by § 27A(b) in finally adjudicated cases as well; for the line that separates lower court judgments that are pending on appeal (or may still be appealed), from lower court judgments that are final, is determined by statute, see, *e. g.*, 28 U. S. C. § 2107(a) (30-day time limit for appeal to federal court of appeals), and so cannot possibly be a *constitutional* line. But a distinction between judgments from which all appeals have been forgone or completed, and judgments that remain on appeal (or subject to being appealed), is implicit in what Article III creates: not a batch of unconnected courts, but a judicial *department* composed of "inferior Courts" and "one supreme Court." Within that hierarchy, the decision of an inferior court is not (unless the time for appeal has expired) the final word of the department as a whole. It is the obligation of the last court in the hierarchy that rules on the case to give effect to Congress's latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must "decide according to existing laws." *Schooner Peggy, supra,* at 109. Having achieved finality, however, a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was. Finality of a legal judgment is determined by statute, just as entitlement to a government benefit is a statutory creation; but that no more deprives the former of its constitutional significance for separation-of-powers analysis than it deprives the latter of its significance for due process purposes. See, *e. g., Cleveland Bd. of Ed.* v. *Loudermill,* 470 U. S. 532 (1985); *Meachum* v. *Fano,* 427 U. S. 215 (1976).

To be sure, § 27A(b) reopens (or directs the reopening of) final judgments in a whole class of cases rather than in a particular suit. We do not see how that makes any differ-

ence. The separation-of-powers violation here, if there is any, consists of depriving judicial judgments of the conclusive effect that they had when they were announced, not of acting in a manner—viz., with particular rather than general effect—that is unusual (though, we must note, not impossible) for a legislature. To be sure, a general statute such as this one may reduce the perception that legislative interference with judicial judgments was prompted by individual favoritism; but it is legislative interference with judicial judgments nonetheless. Not favoritism, nor even corruption, but *power* is the object of the separation-of-powers prohibition. The prohibition is violated when an individual final judgment is legislatively rescinded for even the *very best* of reasons, such as the legislature's genuine conviction (supported by all the law professors in the land) that the judgment was wrong; and it is violated 40 times over when 40 final judgments are legislatively dissolved.

It is irrelevant as well that the final judgments reopened by § 27A(b) rested on the bar of a statute of limitations. The rules of finality, both statutory and judge made, treat a dismissal on statute-of-limitations grounds the same way they treat a dismissal for failure to state a claim, for failure to prove substantive liability, or for failure to prosecute: as a judgment on the merits. See, *e. g.,* Fed. Rule Civ. Proc. 41(b); *United States* v. *Oppenheimer,* 242 U. S. 85, 87–88 (1916). Petitioners suggest, directly or by implication, two reasons why a merits judgment based on this particular ground may be uniquely subject to congressional nullification. First, there is the fact that the length and indeed even the very existence of a statute of limitations upon a federal cause of action is entirely subject to congressional control. But virtually *all* of the reasons why a final judgment on the merits is rendered on a federal claim are subject to congressional control. Congress can eliminate, for example, a particular element of a cause of action that plaintiffs have found it difficult to establish; or an evidentiary rule that has often

excluded essential testimony; or a rule of offsetting wrong (such as contributory negligence) that has often prevented recovery. To distinguish statutes of limitations on the ground that they are mere creatures of Congress is to distinguish them not at all. The second supposedly distinguishing characteristic of a statute of limitations is that it can be extended, without violating the Due Process Clause, after the cause of the action arose and even after the statute itself has expired. See, *e. g., Chase Securities Corp.* v. *Donaldson,* 325 U. S. 304 (1945). But that also does not set statutes of limitations apart. To mention only one other broad category of judgment-producing legal rule: Rules of pleading and proof can similarly be altered after the cause of action arises, *Landgraf* v. *USI Film Products, supra,* at 275, and n. 29, and even, if the statute clearly so requires, after they have been applied in a case but before final judgment has been entered. Petitioners' principle would therefore lead to the conclusion that final judgments rendered on the basis of a stringent (or, alternatively, liberal) rule of pleading or proof may be set aside for retrial under a new liberal (or, alternatively, stringent) rule of pleading or proof. This alone provides massive scope for undoing final judgments and would substantially subvert the doctrine of separation of powers.

The central theme of the dissent is a variant on these arguments. The dissent maintains that *Lampf* "announced" a new statute of limitations, *post,* at 246, in an act of "judicial . . . lawmaking," *post,* at 247, that "changed the law," *post,* at 250. That statement, even if relevant, would be wrong. The point decided in *Lampf* had never before been addressed by this Court, and was therefore an open question, no matter what the lower courts had held at the time. But the more important point is that *Lampf* as such is irrelevant to this case. The dissent itself perceives that "[w]e would have the same issue to decide had Congress enacted the *Lampf* rule," and that the *Lampf* rule's genesis in judicial lawmaking rather than, shall we say, legislative lawmaking, "should not

affect the separation-of-powers analysis." *Post,* at 247. Just so. The issue here is not the validity or even the source of the legal rule that produced the Article III judgments, but rather the immunity from legislative abrogation of those judgments themselves. The separation-of-powers question before us has nothing to do with *Lampf,* and the dissent's attack on *Lampf* has nothing to do with the question before us.

## C

Apart from the statute we review today, we know of no instance in which Congress has attempted to set aside the final judgment of an Article III court by retroactive legislation. That prolonged reticence would be amazing if such interference were not understood to be constitutionally proscribed. The closest analogue that the Government has been able to put forward is the statute at issue in *United States* v. *Sioux Nation,* 448 U. S. 371 (1980). That law required the Court of Claims, " '[n]otwithstanding any other provision of law . . . [to] review on the merits, without regard to the defense of res judicata or collateral estoppel,' " a Sioux claim for just compensation from the United States— even though the Court of Claims had previously heard and rejected that very claim. We considered and rejected separation-of-powers objections to the statute based upon *Hayburn's Case* and *United States* v. *Klein.* See 448 U. S., at 391–392. The basis for our rejection was a line of precedent (starting with *Cherokee Nation* v. *United States,* 270 U. S. 476 (1926)) that stood, we said, for the proposition that "Congress has the power to waive the res judicata effect of a prior judgment entered in the Government's favor on a claim against the United States." *Sioux Nation,* 448 U. S., at 397. And our holding was as narrow as the precedent on which we had relied: "In sum, . . . Congress' mere waiver of the res judicata effect of a prior judicial decision rejecting the validity of a legal claim against the United States does

not violate the doctrine of separation of powers." *Id.*, at 407.[5]

The Solicitor General suggests that even if *Sioux Nation* is read in accord with its holding, it nonetheless establishes that Congress may require Article III courts to reopen their final judgments, since "if res judicata were compelled by Article III to safeguard the structural independence of the courts, the doctrine would not be subject to waiver by any party litigant." Brief for United States 27 (citing *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 850–851 (1986)). But the proposition that legal defenses based upon doctrines central to the courts' structural independence can never be waived simply does not accord with our cases. Certainly one such doctrine consists of the "judicial Power" to disregard an unconstitutional statute, see *Marbury*, 1 Cranch, at 177; yet none would suggest that a litigant may never waive the defense that a statute is unconstitutional. See, *e. g.*, *G. D. Searle & Co.* v. *Cohn*, 455 U. S. 404, 414 (1982). What may follow from our holding that the judicial power unalterably includes the power to render final judgments is not that waivers of res judicata are always impermissible, but rather that, as many Federal Courts of Appeals have held, waivers of res judicata need not always be accepted—that trial courts may in appropriate cases raise the res judicata bar on their own motion. See, *e. g.*, *Coleman* v. *Ramada Hotel Operating Co.*, 933 F. 2d 470, 475 (CA7 1991); *In re Medomak Canning*, 922 F. 2d 895, 904 (CA1 1990); *Holloway Constr. Co.* v. *United States Dept. of Labor*, 891 F. 2d 1211, 1212 (CA6 1989). Waiver subject to the control of the

---

[5] The dissent quotes a passage from the opinion saying that Congress "'only was providing a forum so that a new judicial review of the Black Hills claim could take place.'" *Post*, at 256 (quoting 448 U. S., at 407). That is quite consistent with the res judicata holding. Any party who waives the defense of res judicata provides a forum for a new judicial review.

courts themselves would obviously raise no issue of separation of powers, and would be precisely in accord with the language of the decision that the Solicitor General relies upon. We held in *Schor* that, although a litigant had consented to bring a state-law counterclaim before an Article I tribunal, 478 U. S., at 849, we would nonetheless choose to consider his Article III challenge, because "when these Article III limitations are at issue, notions of consent and waiver cannot be *dispositive*," *id.*, at 851 (emphasis added). See also *Freytag* v. *Commissioner*, 501 U. S. 868, 878–879 (1991) (finding a "rare cas[e] in which we should exercise our discretion" to hear a waived claim based on the Appointments Clause, Art. II, § 2, cl. 2).[6]

Petitioners also rely on a miscellany of decisions upholding legislation that altered rights fixed by the final judgments of non-Article III courts, see, *e. g., Sampeyreac* v. *United States*, 7 Pet. 222, 238 (1833); *Freeborn* v. *Smith*, 2 Wall. 160 (1865), or administrative agencies, *Paramino Lumber Co.* v. *Marshall*, 309 U. S. 370 (1940), or that altered the prospective effect of injunctions entered by Article III courts, *Wheeling & Belmont Bridge Co.*, 18 How., at 421. These cases distinguish themselves; nothing in our holding today calls them into question. Petitioners rely on general statements from some of these cases that legislative annulment of final judgments is not an exercise of judicial power. But even if it were our practice to decide cases by weight of prior dicta, we would find the many dicta that reject congressional

---

[6] The statute at issue in *United States* v. *Sioux Nation*, 448 U. S. 371 (1980), seemingly prohibited courts from raising the res judicata defense *sua sponte*. See *id.*, at 432–433 (REHNQUIST, J., dissenting). The Court did not address that point; as far as appears it saw no reason to raise the defense on its own. Of course the unexplained silences of our decisions lack precedential weight. See, *e. g., Brecht* v. *Abrahamson*, 507 U. S. 619, 630–631 (1993).

power to revise the judgments of Article III courts to be the more instructive authority. See *supra*, at 225–226.[7]

Finally, petitioners liken § 27A(b) to Federal Rule of Civil Procedure 60(b), which authorizes courts to relieve parties from a final judgment for grounds such as excusable neglect, newly discovered evidence, fraud, or "any other reason justifying relief . . . ." We see little resemblance. Rule 60(b), which authorizes discretionary judicial revision of judgments in the listed situations and in other "'extraordinary circumstances,'" *Liljeberg* v. *Health Services Acquisition Corp.*, 486 U. S. 847, 864 (1988), does not impose any legislative mandate to reopen upon the courts, but merely reflects and

---

[7] The dissent tries to turn the dicta of the territorial-court cases, *Sampeyreac* and *Freeborn*, into holdings. It says of *Sampeyreac* that "the relevant judicial power that the [challenged] statute arguably supplanted was this Court's Article III appellate jurisdiction." *Post*, at 253. Even if it were true that the judicial power under discussion was that of this Court (which is doubtful), the point could still not possibly constitute a holding, since there was no "supplanted power" at issue in the case. One of the principal grounds of decision was that the finality of the territorial court's decree had *not* been retroactively abrogated. The decree had been entered under a previous statute which provided that a decree "shall be final and conclusive *between the parties.*" *Sampeyreac* v. *United States*, 7 Pet., at 239 (emphasis in original). The asserted basis for reopening was fraud, in that Sampeyreac did not actually exist. We reasoned that "as Sampeyreac was a fictitious person, he was no party to the decree, and the act [under which the decree had allegedly become final] in strictness does not apply to the case." *Ibid.*

The dissent likewise says of *Freeborn* that "the 'judicial power' to which the opinion referred was this Court's Article III appellate jurisdiction." *Post*, at 255. Once again, even if it was, the point remains dictum. No final judgment was at issue in *Freeborn*. The challenged statute reached only "'cases of appeal or writ of error heretofore prosecuted *and now pending* in the supreme court of the United States,'" see *post*, at 254, n. 7 (quoting 13 Stat. 441) (emphasis added). As we have explained, see *supra*, at 226, Congress may require (insofar as separation-of-powers limitations are concerned) that new statutes be applied in cases not yet final but still pending on appeal.

confirms the courts' own inherent and discretionary power, "firmly established in English practice long before the foundation of our Republic," to set aside a judgment whose enforcement would work inequity. *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U. S. 238, 244 (1944). Thus, Rule 60(b), and the tradition that it embodies, would be relevant refutation of a claim that reopening a final judgment is always a denial of property without due process; but they are irrelevant to the claim that legislative instruction to reopen impinges upon the independent constitutional authority of the courts.

The dissent promises to provide "[a] few contemporary examples" of statutes retroactively requiring final judgments to be reopened, "to demonstrate that [such statutes] are ordinary products of the exercise of legislative power." *Post,* at 256. That promise is not kept. The relevant retroactivity, of course, consists not of the requirement that there be set aside a judgment that has been rendered *prior to its being setting aside*—for example, a statute passed today which says that all default judgments rendered in the future may be reopened within 90 days after their entry. In that sense, *all* requirements to reopen are "retroactive," and the designation is superfluous. Nothing we say today precludes a law such as that. The finality that a court can pronounce is no more than what the law in existence at the time of judgment will permit it to pronounce. If the law then applicable says that the judgment may be reopened for certain reasons, that limitation is built into the judgment itself, and its finality is so conditioned. The present case, however, involves a judgment that Congress subjected to a reopening requirement which did not exist when the judgment was pronounced. The dissent provides not a single clear prior instance of such congressional action.

The dissent cites, first, Rule 60(b), which it describes as a "familiar remedial measure." *Ibid.* As we have just discussed, Rule 60(b) does not provide a new remedy at all, but

is simply the recitation of pre-existing judicial power. The same is true of another of the dissent's examples, 28 U. S. C. § 2255, which provides federal prisoners a statutory motion to vacate a federal sentence. This procedure "'restates, clarifies and simplifies the procedure in the nature of the ancient writ of error coram nobis.'" *United States* v. *Hayman,* 342 U. S. 205, 218 (1952) (quoting the 1948 Reviser's Note to § 2255). It is meaningless to speak of these statutes as applying "retroactively," since they simply codified judicial practice that pre-existed. Next, the dissent cites the provision of the Soldiers' and Sailors' Civil Relief Act of 1940, 54 Stat. 1178, 50 U. S. C. App. § 520(4), which authorizes courts, upon application, to reopen judgments against members of the Armed Forces entered while they were on active duty. It could not be clearer, however, that this provision was not retroactive. It says: "If any judgment *shall be rendered* in any action or proceeding governed by this section against any person in military service during the period of such service . . . *such judgment* may . . . be opened . . . ." (Emphasis added.)

The dissent also cites, *post,* at 258, a provision of the Handicapped Children's Protection Act of 1986, 82 Stat. 901, 20 U. S. C. § 1415(e)(4)(B) (1988 ed. and Supp. V), which provided for the award of attorney's fees under the Education for All Handicapped Children Act of 1975, 89 Stat. 773, 20 U. S. C. § 1411 *et seq.* (1988 ed. and Supp. V). This changed the law regarding attorney's fees under the Education for All Handicapped Children Act, after our decision in *Smith* v. *Robinson,* 468 U. S. 992 (1984), found such fees to be unavailable. The provision of the Statutes at Large adopting this amendment to the United States Code specified, in effect, that it would apply not only to proceedings brought after its enactment, but also to proceedings pending at the time of, or brought after, the decision in *Smith.* See 100 Stat. 798. The amendment says nothing about reopening final judgments, and the retroactivity provision may well mean noth-

ing more than that it applies not merely to new suits commenced after the date of its enactment, but also to *previously* filed (but not yet terminated) suits of the specified sort. This interpretation would be consistent with the only case the dissent cites, which involved a court-entered consent decree not yet fully executed. *Counsel* v. *Dow*, 849 F. 2d 731, 734, 738–739 (CA2 1988). Alternatively, the statute can perhaps be understood to create a new cause of action for attorney's fees attributable to already concluded litigation. That would create no separation-of-powers problem, and would be consistent with this Court's view that "[a]ttorney's fee determinations . . . are 'collateral to the main cause of action' and 'uniquely separable from the cause of action to be proved at trial.'" *Landgraf* v. *USI Film Products*, 511 U. S., at 277 (quoting *White* v. *New Hampshire Dept. of Employment Security*, 455 U. S. 445, 451–452 (1982)).[8]

The dissent's perception that retroactive reopening provisions are to be found all about us is perhaps attributable to its inversion of the statutory presumption regarding retroactivity. Thus, it asserts that Rule 60(b) must be retroactive, since "[n]ot a single word in its text suggests that it does not apply to judgments entered prior to its effective date."

---

[8] Even the dissent's scouring the 50 States for support has proved unproductive. It cites statutes from five States, *post*, at 258–259, nn. 12–13. Four of those statutes involve a virtually identical provision, which permits the state-chartered entity that takes over an insolvent insurance company to apply to have any of the insurer's default judgments set aside. See Del. Code Ann., Tit. 18, § 4418 (1989); Fla. Stat. § 631.734 (1984); N. Y. Ins. Law § 7717 (McKinney Supp. 1995); 40 Pa. Cons. Stat. § 991.1716 (Supp. 1994). It is not at all clear, indeed it seems to us unlikely, that these statutes applied retroactively, to judgments that were final before enactment of the scheme that created the state-chartered entity. The last statute involves a discretionary procedure for allowing appeal by *pro se* litigants, Va. Code Ann. § 8.01–428(C) (Supp. 1994). It is obvious that the provision did not apply retroactively, to judgments rendered before the procedures were established.

*Post*, at 256–257.   This reverses the traditional rule, confirmed only last Term, that statutes do *not* apply retroactively *unless* Congress expressly states that they do.   See *Landgraf, supra*, at 277–280.   The dissent adds that "the traditional construction of remedial measures . . . support[s] construing [Rule 60(b)] to apply to past as well as future judgments."   *Post*, at 257.   But reliance on the vaguely remedial purpose of a statute to defeat the presumption against retroactivity was rejected in the companion cases of *Landgraf*, see 511 U. S., at 284–286, and n. 37, and *Rivers* v. *Roadway Express*, 511 U. S., at 309–313.   Cf. *Landgraf, supra*, at 297 (Blackmun, J., dissenting) ("This presumption [against retroactive legislation] need not be applied to remedial legislation . . .") (citing *Sampeyreac*, 7 Pet., at 238).

The dissent sets forth a number of hypothetical horribles flowing from our assertedly "rigid holding"—for example, the inability to set aside a civil judgment that has become final during a period when a natural disaster prevented the timely filing of a certiorari petition.   *Post*, at 262.   That is horrible not because of our holding, but because the underlying statute *itself* enacts a "rigid" jurisdictional bar to entertaining untimely civil petitions.   Congress could undoubtedly enact *prospective* legislation permitting, or indeed requiring, this Court to make equitable exceptions to an otherwise applicable rule of finality, just as district courts do pursuant to Rule 60(b).   It is no indication whatever of the invalidity of the constitutional rule which we announce, that it produces unhappy consequences when a legislature lacks foresight, and acts belatedly to remedy a deficiency in the law.   That is a routine result of constitutional rules.   See, *e. g.*, *Collins* v. *Youngblood*, 497 U. S. 37 (1990) (*Ex Post Facto* Clause precludes postoffense statutory extension of a criminal sentence); *United States Trust Co. of N. Y.* v. *New Jersey*, 431 U. S. 1 (1977) (Contract Clause prevents retroactive alteration of contract with state bondholders); *Louisville Joint Stock Land Bank* v. *Radford*, 295 U. S. 555, 589–

590, 601–602 (1935) (Takings Clause invalidates a bankruptcy law that abrogates a vested property interest). See also *United States* v. *Security Industrial Bank,* 459 U. S. 70, 78 (1982).

Finally, we may respond to the suggestion of the concurrence that this case should be decided more narrowly. The concurrence is willing to acknowledge only that *"sometimes* Congress lacks the power under Article I to reopen an otherwise closed court judgment," *post,* at 240–241. In the present context, what it considers critical is that § 27A(b) is "exclusively retroactive" and "appli[es] to a limited number of individuals." *Post,* at 241. If Congress had only "provid[ed] some of the assurances against 'singling out' that ordinary legislative activity normally provides—say, prospectivity and general applicability—we might have a different case." *Post,* at 243.

This seems to us wrong in both fact and law. In point of fact, § 27A(b) does not "single out" any defendant for adverse treatment (or any plaintiff for favorable treatment). Rather, it identifies a class of actions (those filed pre-*Lampf,* timely under applicable state law, but dismissed as time barred post-*Lampf*) which embraces many plaintiffs and defendants, the precise number and identities of whom we even now do not know. The concurrence's contention that the number of covered defendants "is too small *(compared with the number of similar, uncovered firms)* to distinguish meaningfully the law before us from a similar law aimed at a single closed case," *post,* at 244 (emphasis added), renders the concept of "singling out" meaningless.

More importantly, however, the concurrence's point seems to us wrong in law. To be sure, the class of actions identified by § 27A(b) could have been more expansive (*e. g.,* all actions that were *or could have been* filed pre-*Lampf*) and the provision could have been written to have prospective as well as retroactive effect (*e. g.,* "all post-*Lampf* dismissed actions, plus all future actions under Rule 10b–5, shall be timely if brought within 30 years of the injury"). But it escapes us

how this could in any way cause the statute to be any less an infringement upon the judicial power. The nub of that infringement consists *not* of the Legislature's acting in a particularized and hence (according to the concurrence) nonlegislative fashion;[9] but rather of the Legislature's nullifying prior, authoritative judicial action. It makes no difference whatever to that separation-of-powers violation that it is in gross rather than particularized (*e. g.*, "we hereby set aside *all* hitherto entered judicial orders"), or that it is not accompanied by an "almost" violation of the Bill of Attainder Clause, or an "almost" violation of any other constitutional provision.

Ultimately, the concurrence agrees with our judgment only "[b]ecause the law before us embodies risks of the very sort that our Constitution's 'separation of powers' prohibition seeks to avoid." *Post*, at 246. But the doctrine of separation of powers is a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified. In its major features (of which the conclusiveness of judicial judgments is assuredly one) it is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict. It is interesting that the concurrence quotes twice, and cites without quotation a third time, the opinion of Justice Powell in

---

[9] The premise that there is something wrong with particularized legislative action is of course questionable. While legislatures usually act through laws of general applicability, that is by no means their only legitimate mode of action. Private bills in Congress are still common, and were even more so in the days before establishment of the Claims Court. Even laws that impose a duty or liability upon a single individual or firm are not on that account invalid—or else we would not have the extensive jurisprudence that we do concerning the Bill of Attainder Clause, including cases which say that it requires not merely "singling out" but also *punishment*, see, *e. g.*, *United States* v. *Lovett*, 328 U. S. 303, 315–318 (1946), and a case which says that Congress may legislate "a legitimate class of one," *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 472 (1977).

*INS* v. *Chadha*, 462 U. S., at 959. But Justice Powell wrote only for himself in that case. He alone expressed dismay that "[t]he Court's decision . . . apparently will invalidate every use of the legislative veto," and opined that "[t]he breadth of this holding gives one pause." *Ibid.* It did not give pause to the six-Justice majority, which put an end to the long-simmering interbranch dispute that would otherwise have been indefinitely prolonged. We think legislated invalidation of judicial judgments deserves the same categorical treatment accorded by *Chadha* to congressional invalidation of executive action. The delphic alternative suggested by the concurrence (the setting aside of judgments is all right so long as Congress does not "impermissibly tr[y] to *apply*, as well as *make*, the law," *post*, at 241) simply prolongs doubt and multiplies confrontation. Separation of powers, a distinctively American political doctrine, profits from the advice authored by a distinctively American poet: Good fences make good neighbors.

\* \* \*

We know of no previous instance in which Congress has enacted retroactive legislation requiring an Article III court to set aside a final judgment, and for good reason. The Constitution's separation of legislative and judicial powers denies it the authority to do so. Section 27A(b) is unconstitutional to the extent that it requires federal courts to reopen final judgments entered before its enactment. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE BREYER, concurring in the judgment.

I agree with the majority that § 27A(b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78aa–1 (1988 ed., Supp. V) (hereinafter § 27A(b)) is unconstitutional. In my view, the separation of powers inherent in our Constitution means that at least *sometimes* Congress lacks the power under Ar-

ticle I to reopen an otherwise closed court judgment. And the statutory provision here at issue, § 27A(b), violates a basic "separation-of-powers" principle—one intended to protect individual liberty. Three features of this law—its exclusively retroactive effect, its application to a limited number of individuals, and its reopening of closed judgments—taken together, show that Congress here impermissibly tried to *apply*, as well as *make*, the law. Hence, § 27A(b) falls outside the scope of Article I. But, it is far less clear, and unnecessary for the purposes of this case to decide, that separation of powers "is violated" *whenever* an "individual final judgment is legislatively rescinded" or that it is "violated 40 times over when 40 final judgments are legislatively dissolved." See *ante*, at 228. I therefore write separately.

The majority provides strong historical evidence that Congress lacks the power simply to reopen, and to revise, final judgments in individual cases. See *ante*, at 219–222. The Framers would have hesitated to lodge in the Legislature both that kind of power and the power to enact general laws, as part of their effort to avoid the "despotic government" that accompanies the "accumulation of all powers, legislative, executive, and judiciary, in the same hands." The Federalist No. 47, p. 241 (J. Gideon ed. 1831) (J. Madison); *id.*, No. 48, at 249 (quoting T. Jefferson, Notes on the State of Virginia). For one thing, the authoritative application of a general law to a particular case by an independent judge, rather than by the legislature itself, provides an assurance that even an unfair law at least will be applied evenhandedly according to its terms. See, *e. g.*, 1 Montesquieu, The Spirit of Laws 174 (T. Nugent transl. 1886) (describing one objective of the "separation of powers" as preventing "the same monarch or senate," having "enact[ed] tyrannical laws" from "execut[ing] them in a tyrannical manner"); W. Gwyn, The Meaning of the Separation of Powers 42–43, 104–106 (1965) (discussing historically relevant sources that explain one purpose of separation of powers as helping to assure an "impartial rule of

law"). For another thing, as Justice Powell has pointed out, the Constitution's "separation-of-powers" principles reflect, in part, the Framers' "concern that a legislature should not be able unilaterally to impose a substantial deprivation on one person." *INS* v. *Chadha*, 462 U. S. 919, 962 (1983) (opinion concurring in judgment). The Framers "expressed" this principle, both in "specific provisions, such as the Bill of Attainder Clause," and in the Constitution's "general allocation of power." *Ibid.;* see *United States* v. *Brown*, 381 U. S. 437, 442 (1965) (Bill of Attainder Clause intended to implement the separation of powers, acting as "a general safeguard against legislative exercise of the judicial function"); *Fletcher* v. *Peck*, 6 Cranch 87, 136 (1810) (Marshall, C. J.) ("It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments"); cf. *Hurtado* v. *California*, 110 U. S. 516, 535–536 (1884).

Despite these two important "separation-of-powers" concerns, *sometimes* Congress can enact legislation that focuses upon a small group, or even a single individual. See, *e. g.,* *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 468–484 (1977); *Selective Service System* v. *Minnesota Public Interest Research Group*, 468 U. S. 841, 846–856 (1984); *Brown, supra,* at 453–456. Congress also sometimes passes private legislation. See *Chadha, supra,* at 966, n. 9 (Powell, J., concurring in judgment) ("When Congress grants particular individuals relief or benefits under its spending power, the danger of oppressive action that the separation of powers was designed to avoid is not implicated"). And, *sometimes* Congress can enact legislation that, as a practical matter, radically changes the effect of an individual, previously entered court decree. See *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421 (1856). Statutes that apply prospectively and (in part because of that prospectivity) to an open-ended class of persons, however, are more than sim-

ply an effort to apply, person by person, a previously enacted law, or to single out for oppressive treatment one, or a handful, of particular individuals. Thus, it seems to me, if Congress enacted legislation that reopened an otherwise closed judgment but in a way that mitigated some of the here relevant "separation-of-powers" concerns, by also providing some of the assurances against "singling out" that ordinary legislative activity normally provides—say, prospectivity and general applicability—we might have a different case. Cf. *Brown, supra,* at 461 ("Congress must accomplish [its desired] results by rules of general applicability. It cannot specify the people upon whom the sanction it prescribes is to be levied"). Because such legislation, in light of those mitigating circumstances, might well present a different constitutional question, I do not subscribe to the Court's more absolute statement.

The statute before us, however, has no such mitigating features. It reopens previously closed judgments. It is entirely retroactive, applying only to those Rule 10b–5 actions actually filed, on or before (but on which final judgments were entered after) June 19, 1991. See 15 U. S. C. § 78j(b) and 17 CFR 240.10b–5 (1994). It lacks generality, for it applies only to a few individual instances. See Hearings on H. R. 3185 before the Subcommittee on Telecommunications and Finance of the House of Representatives Committee on Energy and Commerce, 102d Cong., 1st Sess., 3–4 (1991) (listing, by case name, only 15 cases that had been dismissed on the basis of *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson,* 501 U. S. 350 (1991)). And, it is underinclusive, for it excludes from its coverage others who, relying upon pre-*Lampf* limitations law, may have failed to bring timely securities fraud actions against any other of the Nation's hundreds of thousands of businesses. I concede that its coverage extends beyond a single individual to many potential plaintiffs in these class actions. But because the legislation disfavors not plaintiffs but defendants, I should think

that the latter number is the more relevant. And, that number is too small (compared with the number of similar, uncovered firms) to distinguish meaningfully the law before us from a similar law aimed at a single closed case. Nor does the existence of § 27A(a), which applies to Rule 10b–5 actions pending at the time of the legislation, change this conclusion. That provision seems aimed at too few additional individuals to mitigate the low level of generality of § 27A(b). See Hearings on H. R. 3185, *supra,* at 5–6 (listing 17 cases in which dismissal motions based on *Lampf* were pending).

The upshot is that, viewed in light of the relevant, liberty-protecting objectives of the "separation of powers," this case falls directly within the scope of language in this Court's cases suggesting a restriction on Congress' power to reopen closed court judgments. See, *e. g., Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103, 113 (1948) ("Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised [or] overturned . . . by another Department of Government"); *Wheeling & Belmont Bridge Co., supra,* at 431 ("[I]f the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress"); *Hayburn's Case,* 2 Dall. 409, 413 (1792) (letter from Justice Iredell and District Judge Sitgreaves to President Washington) ("[N]o decision of any court of the United States can, under any circumstances, in our opinion, agreeable to the Constitution, be liable to a revision, or even suspension, by the Legislature itself").

At the same time, because the law before us *both* reopens final judgments *and* lacks the liberty-protecting assurances that prospectivity and greater generality would have provided, we need not, and we should not, go further—to make of the reopening itself, an absolute, always determinative distinction, a "prophylactic device," or a foundation for the building of a new "high wal[l]" between the branches.

*Ante,* at 239. Indeed, the unnecessary building of such walls is, in itself, dangerous, because the Constitution blends, as well as separates, powers in its effort to create a government that will work for, as well as protect the liberties of, its citizens. See The Federalist No. 48 (J. Madison). That doctrine does not "divide the branches into watertight compartments," nor "establish and divide fields of black and white." *Springer* v. *Philippine Islands,* 277 U. S. 189, 209, 211 (1928) (Holmes, J., dissenting); see also *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635 (1952) (Jackson, J., concurring) (referring to the need for "workable government"); *id.,* at 596–597 (Frankfurter, J., concurring); *Mistretta* v. *United States,* 488 U. S. 361, 381 (1989) (the doctrine does not create a "hermetic division among the Branches" but "a carefully crafted system of checked and balanced power within each Branch"). And, important separation-of-powers decisions of this Court have sometimes turned, not upon absolute distinctions, but upon degree. See, *e. g., Crowell* v. *Benson,* 285 U. S. 22, 48–54 (1932); *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 551–555 (1935) (Cardozo, J., concurring). As the majority invokes the advice of an American poet, one might consider as well that poet's caution, for he not only notes that "Something there is that doesn't love a wall," but also writes, "Before I built a wall I'd ask to know/ What I was walling in or walling out." R. Frost, Mending Wall, The New Oxford Book of American Verse 395–396 (R. Ellmann ed. 1976).

Finally, I note that the cases the dissent cites are distinguishable from the one before us. *Sampeyreac* v. *United States,* 7 Pet. 222 (1833), considered a law similar to § 27A(b) (it reopened a set of closed judgments in fraud cases), but the Court did not reach the here relevant issue. Rather, the Court rested its conclusion upon the fact that Sampeyreac was not "a real person," while conceding that, were he real, the case "might present a different question." *Id.,* at 238–239. *Freeborn* v. *Smith,* 2 Wall. 160 (1865), which involved

an Article I court, upheld a law that applied to all cases pending on appeal (in the Supreme Court) from the territory of Nevada, irrespective of the causes of action at issue or which party was seeking review. See *id.*, at 162. That law had generality, a characteristic that helps to avoid the problem of legislatively singling out a few individuals for adverse treatment. See *Chadha*, 462 U. S., at 966 (Powell, J., concurring in judgment). Neither did *United States* v. *Sioux Nation*, 448 U. S. 371 (1980), involve legislation that adversely treated a few individuals. Rather, it permitted the reopening of a case against the United States. See *id.*, at 391.

Because the law before us embodies risks of the very sort that our Constitution's "separation-of-powers" prohibition seeks to avoid, and because I can find no offsetting legislative safeguards that normally offer assurances that minimize those risks, I agree with the Court's conclusion and I join its judgment.

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

On December 19, 1991, Congress enacted §27A of the Securities Exchange Act of 1934, 15 U. S. C. §78aa–1 (1988 ed., Supp. V) (hereinafter 1991 amendment), to remedy a flaw in the limitations rule this Court announced on June 20, 1991, in *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350 (1991). In *Lampf* the Court replaced the array of state statutes of limitations that had governed shareholder actions under the Securities Exchange Act of 1934, 15 U. S. C. §78j(b), and Rule 10b–5, 17 CFR 240.10b–5 (1994) (hereinafter 10b–5 actions), with a uniform federal limitations rule. Congress found only one flaw in the Court's new rule: its failure to exempt pending cases from its operation. Accordingly, without altering the prospective effect of the *Lampf* rule, the 1991 amendment remedied its flaw by providing that pre-*Lampf* law should determine the limitations period applicable to all cases that had

been pending on June 20, 1991—both those that remained pending on December 19, 1991, when § 27A was enacted, and those that courts dismissed between June 20 and December 19, 1991. Today the Court holds that the 1991 amendment violates the Constitution's separation of powers because, by encompassing the dismissed claims, it requires courts to re-open final judgments in private civil actions.

Section 27A is a statutory amendment to a rule of law announced by this Court. The fact that the new rule announced in *Lampf* was a product of judicial, rather than congressional, lawmaking should not affect the separation-of-powers analysis. We would have the same issue to decide had Congress enacted the *Lampf* rule but, as a result of inadvertence or perhaps a scrivener's error, failed to exempt pending cases, as is customary when limitations periods are shortened.[1] In my opinion, if Congress had retroactively restored rights its own legislation had inadvertently or unfairly impaired, the remedial amendment's failure to exclude dismissed cases from the benefited class would not make it invalid. The Court today faces a materially identical situation and, in my view, reaches the wrong result.

Throughout our history, Congress has passed laws that allow courts to reopen final judgments. Such laws characteristically apply to judgments entered before as well as after their enactment. When they apply retroactively, they may raise serious due process questions,[2] but the Court

---

[1] Our decisions prior to *Lampf* consistently held that retroactive application of new, shortened limitations periods would violate "fundamental notions of justified reliance and due process." *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350, 371 (1991) (O'CONNOR, J., dissenting); see, *e. g., Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971); *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604 (1987).

[2] Because the Court finds a separation-of-powers violation, it does not reach respondents' alternative theory that § 27A(b) denied them due process under the Fifth Amendment, a theory the Court of Appeals did not identify as an alternative ground for its holding. In my judgment, the statute easily survives a due process challenge. Section 27A(b) is ration-

has never invalidated such a law on separation-of-powers grounds until today. Indeed, only last Term we recognized Congress' ample power to enact a law that "in effect 'restored' rights that [a party] reasonably and in good faith thought he possessed before the surprising announcement" of a Supreme Court decision. *Rivers* v. *Roadway Express, Inc.*, 511 U. S. 298, 310 (1994) (discussing *Frisbie* v. *Whitney,* 9 Wall. 187 (1870)). We conditioned our unambiguous restatement of the proposition that "Congress had the *power* to enact legislation that had the practical effect of restoring the status quo retroactively," 511 U. S., at 310, only on Congress' clear expression of its intent to do so.

A large class of investors reasonably and in good faith thought they possessed rights of action before the surprising announcement of the *Lampf* rule on June 20, 1991. When it enacted the 1991 amendment, Congress clearly expressed its intent to restore the rights *Lampf* had denied the aggrieved class. Section 27A comported fully with *Rivers* and with other precedents in which we consistently have recognized Congress' power to enact remedial statutes that set aside classes of final judgments. The only remarkable feature of

---

ally related to a legitimate public purpose. Cf., *e. g., Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.,* 508 U. S. 602, 636–641 (1993). Given the existence of statutes and rules, such as Rule 60(b), that allow courts to reopen apparently "final" judgments in various circumstances, see *infra,* at 256–259, respondents cannot assert an inviolable "vested right" in the District Court's post-*Lampf* dismissal of petitioners' claims. In addition, § 27A(b) did not upset any "settled expectations" of respondents. Cf. *Landgraf* v. *USI Film Products,* 511 U. S. 244, 266 (1994). In *Landgraf,* we concluded that Congress did not intend § 102 of the Civil Rights Act of 1991, 42 U. S. C. § 1981a (1988 ed., Supp. V), to apply retroactively because retroactive application would have placed a new legal burden on past conduct. 511 U. S., at 280–286. Before 1991 no one could have relied either on the yet-to-be-announced rule in *Lampf* or on the Court's unpredictable decision to apply that rule retroactively. All of the reliance interests that ordinarily support a presumption against retroactivity militate in favor of allowing retroactive application of § 27A.

this enactment is the fact that it remedied a defect in a new judge-made rule rather than in a statute.

The familiar history the Court invokes, involving colonial legislatures' ad hoc decisions of individual cases, " 'unfettered by rules,' " *ante*, at 220 (quoting Vermont State Papers 1779–1786, p. 540 (Slade ed. 1823)), provides no support for its holding. On the contrary, history and precedent demonstrate that Congress may enact laws that establish both substantive rules and procedures for reopening final judgments. When it enacted the 1991 amendment to the *Lampf* rule, Congress did not encroach on the judicial power. It decided neither the merits of any 10b–5 claim nor even whether any such claim should proceed to decision on the merits. It did provide that the rule governing the timeliness of 10b–5 actions pending on June 19, 1991, should be the pre-*Lampf* statute of limitations, and it also established a procedure for Article III courts to apply in determining whether any dismissed case should be reinstated. Congress' decision to extend that rule and procedure to 10b–5 actions dismissed during the brief period between this Court's law-changing decision in *Lampf* and Congress' remedial action is not a sufficient reason to hold the statute unconstitutional.

I

Respondents conducted a public offering of common stock in 1983. Petitioners, suing on behalf of themselves and other purchasers of the stock, filed a 10b–5 action in 1987 in the United States District Court for the Eastern District of Kentucky, alleging violations of substantive federal rules that had been in place since 1934. Respondents moved to dismiss the complaint as untimely because petitioners had filed it more than three years after the events in dispute. At that time, settled law in Kentucky and elsewhere in the United States directed federal courts to determine statutes of limitations applicable to 10b–5 actions by reference to

state law.[3]  The relevant Kentucky statute provided a 3-year limitations period,[4] which petitioners contended ran from the time the alleged fraud was or should have been discovered.  A Magistrate agreed with petitioners and recommended denial of respondents' motion to dismiss, but by 1991 the District Court had not yet ruled on that issue.  The factual question whether petitioners should have discovered respondents' alleged 10b–5 violations more than three years before they filed suit remained open for decision by an Article III judge on June 20, 1991.

On that day, this Court's decision in *Lampf* changed the law.  The Court concluded that every 10b–5 action is time barred unless brought within three years of the alleged violation and one year of its discovery.  Moreover, it applied that novel rule to pending cases.  As JUSTICE O'CONNOR pointed out in her dissent, the Court held the plaintiffs' suit "time barred under a limitations period that did not exist before," a holding that "depart[ed] drastically from our established practice and inflict[ed] an injustice on the [plaintiffs]."  *Lampf,* 501 U. S., at 369.[5]  The inequitable consequences of *Lampf* reached beyond the parties to that case,

---

[3] "Federal judges have 'borrowed' state statutes of limitations because they were directed to do so by the Congress of the United States under the Rules of Decision Act, 28 U. S. C. § 1652." *Lampf,* 501 U. S., at 367, n. 2 (STEVENS, J., dissenting) (citations omitted); see, *e. g., Stull* v. *Bayard,* 561 F. 2d 429, 431–432 (CA2 1977), cert. denied, 434 U. S. 1035 (1978); *Roberts* v. *Magnetic Metals Co.,* 611 F. 2d 450, 456 (CA3 1979); *Robuck* v. *Dean Witter & Co.,* 649 F. 2d 641, 644 (CA9 1980) (borrowing state statutes of limitations for 10b–5 actions).

[4] See Ky. Rev. Stat. Ann. § 292.480(3) (Michie 1988).

[5] The *Lampf* opinion drew two other dissents. JUSTICE KENNEDY, joined by JUSTICE O'CONNOR, would have adopted a different substantive limitations rule.  See 501 U. S., at 374.  JUSTICE SOUTER and I would have adhered to "four decades of . . . settled law" and maintained the existing regime until Congress enacted a new federal statute of limitations.  *Id.,* at 366–367 (STEVENS, J., dissenting).  No one dissented from the proposition that a uniform federal limitations period would be wise policy.

injuring a large class of litigants that includes petitioners. Without resolving the factual issue that would have determined the timeliness of petitioners' complaint before *Lampf*, the District Court dismissed the instant action as untimely under the new limitations period dictated by this Court. Because *Lampf* had deprived them of any nonfrivolous basis for an appeal, petitioners acquiesced in the dismissal, which therefore became final on September 12, 1991.

Congress responded to *Lampf* by passing § 27A, which became effective on December 19, 1991. The statute changed the substantive limitations law, restoring the pre-*Lampf* limitations rule for two categories of 10b–5 actions that had been pending on June 19, 1991. Subsection (a) of § 27A applies to cases that were still pending on December 19, 1991. The Courts of Appeals have uniformly upheld the constitutionality of that subsection,[6] and its validity is not challenged in this case. Subsection (b) applies to actions, like the instant case, that (1) were dismissed after June 19, 1991, and (2) would have been timely under the pre-*Lampf* regime. This subsection authorized the district courts to reinstate dismissed cases if the plaintiff so moved within 60 days after the effective date of § 27A. The amendment was not self-executing: Unless the plaintiff both filed a timely motion for reinstatement and then satisfied the court that the complaint had been timely filed under applicable pre-*Lampf* law, the dismissal would remain in effect.

In this case petitioners made the required showing, but the District Court refused to reinstate their case. Instead,

---

[6] See *Cooperativa de Ahorro y Credito Aguada* v. *Kidder, Peabody & Co.*, 993 F. 2d 269 (CA1), cert. pending, No. 93–564; *Axel Johnson Inc.* v. *Arthur Andersen & Co.*, 6 F. 3d 78 (CA2 1993); *Cooke* v. *Manufactured Homes, Inc.*, 998 F. 2d 1256 (CA4 1993); *Berning* v. *A. G. Edwards & Sons, Inc.*, 990 F. 2d 272 (CA7 1993); *Gray* v. *First Winthrop Corp.*, 989 F. 2d 1564 (CA9 1993); *Anixter* v. *Home-Stake Production Co.*, 977 F. 2d 1533 (CA10 1992), cert. denied *sub nom. Dennler* v. *Trippet*, 507 U. S. 1029 (1993); *Henderson* v. *Scientific-Atlanta, Inc.*, 971 F. 2d 1567 (CA11 1992), cert. denied, 510 U. S. 828 (1993).

it held § 27A(b) unconstitutional. 789 F. Supp. 231 (ED Ky. 1992). The Court of Appeals for the Sixth Circuit, contrary to an earlier decision of the Fifth Circuit, affirmed. 1 F. 3d 1487 (1993).

## II

Aside from § 27A(b), the Court claims to "know of no instance in which Congress has attempted to set aside the final judgment of an Article III court by retroactive legislation." *Ante*, at 230. In fact, Congress has done so on several occasions. Section 27A(b) is part of a remedial statute. As early as 1833, we recognized that a remedial statute authorizing the reopening of a final judgment after the time for appeal has expired is "entirely unexceptionable" even though it operates retroactively. "It has been repeatedly decided in this court, that the retrospective operation of such a law forms no objection to it. Almost every law, providing a new remedy, affects and operates upon causes of action existing at the time the law is passed." *Sampeyreac* v. *United States*, 7 Pet. 222, 239 (1833). We have upheld remedial statutes that carried no greater cause for separation-of-powers concerns than does § 27A(b); others have provoked no challenges. In contrast, the colonial directives on which the majority relies were nothing like remedial statutes.

The remedial 1830 law we construed in *Sampeyreac* strongly resembled § 27A(b): It authorized a class of litigants to reopen claims, brought under an 1824 statute, that courts had already finally adjudicated. The 1824 statute authorized proceedings to establish title to certain lands in the State of Missouri and the territory of Arkansas. It provided for an appeal to this Court within one year after the entry of the judgment or decree, "and should no appeal be taken, the judgment or decree of the district court shall in like manner be final and conclusive." 7 Pet., at 238. In 1827 the Arkansas Territorial Court entered a decree in favor of one Sampeyreac, over the objection of the United States that the nominal plaintiff was a fictitious person. Because no appeal

was taken from that decree, it became final in 1828. In 1830 Congress passed a special statute authorizing the Arkansas court to reopen any decree entered under the 1824 statute if, prior to July 1, 1831, the United States filed a bill of review alleging that the decree had been based on forged evidence of title. The United States filed such a bill and obtained a reversal of the 1827 decree from the Arkansas court.

The successors in interest of the fictitious Mr. Sampeyreac argued in this Court that the Arkansas court should not have entertained the Government's bill of review because the 1830 statute "was the exercise of a judicial power, and it is no answer to this objection, that the execution of its provisions is given to a court. The legislature of the union cannot use such a power." *Id.*, at 229. We categorically rejected that argument: "The law of 1830 is in no respect the exercise of judicial powers." *Id.*, at 239. Of course, as the majority notes, *ante*, at 232–233, the particular decree at stake in *Sampeyreac* had issued not from an Article III court but from a territorial court. However, our opinion contains no suggestion that Congress' power to authorize the reopening of judgments entered by the Arkansas court was any broader than its power to authorize the reopening of judgments entered under the same statute by the United States District Court in Missouri. Moreover, the relevant judicial power that the 1830 statute arguably supplanted was this Court's Article III appellate jurisdiction—which, prior to the 1830 enactment, provided the only avenue for review of the trial courts' judgments.

Similarly, in *Freeborn* v. *Smith*, 2 Wall. 160 (1865), the Court rejected a challenge to an Act of Congress that removed an accidental impediment to the exercise of our appellate jurisdiction. When Congress admitted Nevada into the Union as a State in March 1864, ch. 36, 13 Stat. 30, it neglected to provide for the disposition of pending appeals from final judgments previously entered by the Supreme Court of

the Nevada Territory. Accordingly, the *Freeborn* defendants in error moved to dismiss a writ of error to the territorial court on the ground that we had no power to decide the case. At the suggestion of plaintiffs in error, the Court deferred ruling on the motion until after February 27, 1865, when Congress passed a special statute that authorized the Court to decide this and similar cases.[7] Defendants in error renewed their motion, arguing that Congress could not reopen judgments that were already final and unreviewable because Congress was not competent to exercise judicial power.

Defendants in error argued that, "[i]f it be possible for a right to attach itself to a judgment, it has done so here, and there could not be a plainer case of an attempt to destroy it by legislative action." 2 Wall., at 165. The Court, however, noted that the omission in the 1864 statute had left the case "in a very anomalous situation," *id.*, at 174, and that passage of the later statute "was absolutely necessary to remove an impediment in the way of any legal proceeding in the case." *Id.*, at 175. It concluded that such "acts are of a remedial character, and are peculiar subjects of legislation. They are not liable to the imputation of being assumptions of judicial power." *Ibid.* As in *Sampeyreac*, although *Freeborn* in-

---

[7] The Act provided, in part:

"That all cases of appeal or writ of error heretofore prosecuted and now pending in the supreme court of the United States, upon any record from the supreme court of the Territory of Nevada, may be heard and determined by the supreme court of the United States, and the mandate of execution or of further proceedings shall be directed by the supreme court of the United States to the district court of the United States for the district of Nevada, or to the supreme court of the State of Nevada, as the nature of said appeal or writ of error may require, and each of these courts shall be the successor of the supreme court of Nevada Territory as to all such cases, with full power to hear and determine the same, and to award mesne or final process thereon. . . . *Provided,* That said appeals shall be prosecuted and said writs of errors sued out at any time before the first day of July, eighteen hundred and sixty-six." Ch. 64, § 8, 13 Stat. 441.

volved the review of a judgment entered by a territorial court, the "judicial power" to which the opinion referred was this Court's Article III appellate jurisdiction. If Congress may enact a law authorizing this Court to reopen decisions that we previously lacked power to review, Congress must have the power to let district courts reopen their own judgments.

Also apposite is *United States* v. *Sioux Nation*, 448 U. S. 371 (1980), which involved the Sioux Nation's longstanding claim that the Government had in 1877 improperly abrogated the treaty by which the Sioux had held title to the Black Hills. The Sioux first brought their claim under a special 1920 jurisdictional statute. The Court of Claims dismissed the suit in 1942, holding that the 1920 Act did not give the court jurisdiction to consider the adequacy of the compensation the Government had paid in 1877. Congress passed a new jurisdictional statute in 1946, and in 1950 the Sioux brought a new action. In 1975 the Court of Claims, although acknowledging the merit of the Sioux's claim, held that the res judicata effect of the 1942 dismissal barred the suit. In response, Congress passed a statute in 1978 that authorized the Court of Claims to take new evidence and instructed it to consider the Sioux's claims on the merits, disregarding res judicata. The Sioux finally prevailed. We held that the 1978 Act did not violate the separation of powers. 448 U. S., at 407.

The Court correctly notes, see *ante*, at 230–231, and n. 5, that our opinion in *Sioux Nation* prominently discussed precedents establishing Congress' power to waive the res judicata effect of judgments against the United States. We never suggested, however, that those precedents sufficed to overcome the separation-of-powers objections raised against the 1978 Act. Instead, we made extensive comments about the propriety of Congress' action that were as necessary to our holding then as they are salient to the Court's analysis today. In passing the 1978 Act, we held, Congress

"only was providing a forum so that a new judicial review of the Black Hills claim could take place. This review was to be based on the facts found by the Court of Claims after reviewing all the evidence, and an application of generally controlling legal principles to those facts. For these reasons, Congress was not reviewing the merits of the Court of Claims' decisions, and did not interfere with the finality of its judgments.

"Moreover, Congress in no way attempted to prescribe the outcome of the Court of Claims' new review of the merits." 448 U. S., at 407.

Congress observed the same boundaries in enacting § 27A(b).

Our opinions in *Sampeyreac, Freeborn,* and *Sioux Nation* correctly characterize statutes that specify new grounds for the reopening of final judgments as remedial. Moreover, these precedents correctly identify the unremarkable nature of the legislative power to enact remedial statutes. "[A]cts . . . of a remedial character . . . are the peculiar subjects of legislation. They are not liable to the imputation of being assumptions of judicial power." *Freeborn,* 2 Wall., at 175. A few contemporary examples of such statutes will suffice to demonstrate that they are ordinary products of the exercise of legislative power.

The most familiar remedial measure that provides for reopening of final judgments is Rule 60(b) of the Federal Rules of Civil Procedure. That Rule both codified common-law grounds for relieving a party from a final judgment and added an encompassing reference to "any other reason justifying relief from the operation of the judgment."[8] Not a

---

[8] The full text of Rule 60(b) provides:

"On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic),

single word in its text suggests that it does not apply to judgments entered prior to its effective date. On the contrary, the purpose of the Rule, its plain language, and the traditional construction of remedial measures all support construing it to apply to past as well as future judgments. Indeed, because the Rule explicitly abolished the common-law writs it replaced, an unintended gap in the law would have resulted if it did not apply retroactively.[9]

---

misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U. S. C. § 1655, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action."

This Court adopted the Federal Rules of Civil Procedure and submitted them to Congress as the Rules Enabling Act required. They became effective after Congress adjourned without altering them. See generally 308 U. S. 647 (letter of transmittal to Congress, Jan. 3, 1938).

[9] In its criticism of this analysis of Rule 60(b), the majority overstates our holdings on retroactivity in *Landgraf*, 511 U. S., at 280, and *Rivers* v. *Roadway Express, Inc.*, 511 U. S. 298 (1994). Our opinion in *Landgraf* nowhere says "that statutes do *not* apply retroactively *unless* Congress expressly states that they do." *Ante*, at 237. To the contrary, it says that, "[w]hen . . . the statute contains no such express command, the court must determine whether the new statute would have retroactive effect," an inquiry that requires "clear congressional *intent* favoring such a result." *Landgraf*, 511 U. S., at 280 (emphasis added); see also *id.*, at 273–275; *Rivers*, 511 U. S., at 304–309. In the case of Rule 60(b), the factors I have identified, taken together, support a finding of clear congressional

Other examples of remedial statutes that resemble § 27A include the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U. S. C. App. § 520(4), which authorizes members of the Armed Forces to reopen judgments entered while they were on active duty; the Handicapped Children's Protection Act of 1986, 20 U. S. C. § 1415(e)(4)(B) (1988 ed. and Supp. V), which provided for recovery of attorney's fees under the Education for All Handicapped Children Act of 1975, 20 U. S. C. § 1411 *et seq.* (1988 ed. and Supp. V);[10] and the federal habeas corpus statute, 28 U. S. C. § 2255, which authorizes federal courts to reopen judgments of conviction. The habeas statute, similarly to Rule 60(b), replaced a common-law writ, see App. to H. R. Rep. No. 308, 80th Cong., 2d Sess., A180 (1947), and thus necessarily applied retroactively.[11] State statutes that authorize the reopening of various types of default judgments[12] and judgments that became final before a party re-

---

intent. Moreover, neither *Landgraf* nor *Rivers* "rejected" consideration of a statute's remedial purpose in analyzing Congress' intent to apply the statute retroactively. Compare *ante,* at 237, with *Landgraf,* 511 U. S., at 281–286, and n. 37, and *Rivers,* 511 U. S., at 304–311.

[10] When it enacted the Handicapped Children's Protection Act, Congress overruled our contrary decision in *Smith* v. *Robinson,* 468 U. S. 992 (1984), by applying the Act retroactively to any action either pending on or brought after July 4, 1984, the day before we announced *Smith.* See 100 Stat. 798. Accordingly, a court has applied the Act retroactively to a case in which the parties had entered into a consent decree prior to its enactment. See *Counsel* v. *Dow,* 849 F. 2d 731, 738–739 (CA2 1988). The Court's attempts to explain away the retroactivity provision, *ante,* at 235–236, simply do not comport with the plain language of the Act.

[11] The Government also calls our attention to 28 U. S. C. § 1655, a statute that requires courts to reopen final *in rem* judgments upon entries of appearance by defendants who were not personally served. See Brief for United States 24–25, and n. 17. While that statute had only prospective effect, the Court offers no reason why Congress could not pass a similar statute that would apply retroactively to judgments entered under pre-existing procedures.

[12] See, *e. g.,* Del. Code Ann., Tit. 18, § 4418 (1989); Fla. Stat. § 631.734 (1984); N. Y. Ins. Law § 7717 (McKinney Supp. 1995); 40 Pa. Cons. Stat. § 991.1716 (Supp. 1994).

ceived notice of their entry,[13] as well as provisions for motions to reopen based on newly discovered evidence,[14] further demonstrate the widespread acceptance of remedial statutes that allow courts to set aside final judgments. As in the case of Rule 60(b), logic dictates that these statutes be construed to apply retroactively to judgments that were final at the time of their enactments. All of these remedial statutes announced generally applicable rules of law as well as establishing procedures for reopening final judgments.[15]

In contrast, in the examples of colonial legislatures' review of trial courts' judgments on which today's holding rests, the legislatures issued directives in individual cases without purporting either to set forth or to apply any legal standard. Cf. *ante*, at 219–225; see, *e. g.*, *INS* v. *Chadha*, 462 U. S. 919, 961–962 (1983) (Powell, J., concurring in judgment). The principal compendium on which the Court relies, *ante*, at 219, accurately describes these legislative directives:

> "In these records, which are of the first quarter of the 18th century, the provincial legislature will often be found acting in a judicial capacity, sometimes trying causes in equity, sometimes granting equity powers to some court of the common law for a particular temporary purpose, and constantly granting appeals, new trials, and other relief from judgments, on equitable

---

[13] For example, a Virginia statute provides that, when a *pro se* litigant fails to receive notice of the trial court's entry of an order, even after the time to appeal has expired, the trial judge may within 60 days vacate the order and grant the party leave to appeal. Va. Code Ann. § 8.01–428(C) (Supp. 1994).

[14] See *Herrera* v. *Collins*, 506 U. S. 390, 410–411, and nn. 8–11 (1993) (citing state statutes).

[15] The Court offers no explanation of why the Constitution should be construed to interpose an absolute bar against these statutes' retroactive application. Under the Court's reasoning, for example, an amendment that broadened the coverage of Rule 60(b) could not apply to any inequitable judgments entered prior to the amendment. The Court's rationale for this formalistic restriction remains elusive.

grounds." Judicial Action by the Provincial Legislature of Massachusetts, 15 Harv. L. Rev. 208, n. 1 (1902).

The Framers' disapproval of such a system of ad hoc legislative review of individual trial court judgments has no bearing on remedial measures such as Rule 60(b) or the 1991 amendment at issue today. The history on which the Court relies provides no support for its holding.

## III

The lack of precedent for the Court's holding is not, of course, a sufficient reason to reject it. Correct application of separation-of-powers principles, however, confirms that the Court has reached the wrong result. As our most recent major pronouncement on the separation of powers noted, "we have never held that the Constitution requires that the three branches of Government 'operate with absolute independence.'" *Morrison* v. *Olson,* 487 U. S. 654, 693–694 (1988) (quoting *United States* v. *Nixon,* 418 U. S. 683, 707 (1974)). Rather, our jurisprudence reflects "Madison's flexible approach to separation of powers." *Mistretta* v. *United States,* 488 U. S. 361, 380 (1989). In accepting Madison's conception rather than any "hermetic division among the Branches," *id.,* at 381, "we have upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment," *id.,* at 382. Today's holding does not comport with these ideals.

Section 27A shares several important characteristics with the remedial statutes discussed above. It does not decide the merits of any issue in any litigation but merely removes an impediment to judicial decision on the merits. The impediment it removes would have produced inequity because the statute's beneficiaries did not cause the impediment. It requires a party invoking its benefits to file a motion within a specified time and to convince a court that the statute entitles the party to relief. Most important, § 27A(b) specifies

both a substantive rule to govern the reopening of a class of judgments—the pre-*Lampf* limitations rule—and a procedure for the courts to apply in determining whether a particular motion to reopen should be granted. These characteristics are quintessentially legislative. They reflect Congress' fealty to the separation of powers and its intention to avoid the sort of ad hoc excesses the Court rightly criticizes in colonial legislative practice. In my judgment, all of these elements distinguish § 27A from "judicial" action and confirm its constitutionality. A sensible analysis would at least consider them in the balance.

Instead, the Court myopically disposes of § 27A(b) by holding that Congress has no power to "requir[e] an Article III court to set aside a final judgment." *Ante*, at 240. That holding must mean one of two things. It could mean that Congress may not impose a mandatory duty on a court to set aside a judgment even if the court makes a particular finding, such as a finding of fraud or mistake, that Congress has not made. Such a rule, however, could not be correct. Although Rule 60(b), for example, merely authorizes federal courts to set aside judgments after making appropriate findings, Acts of Congress characteristically set standards that judges are obligated to enforce. Accordingly, Congress surely could add to Rule 60(b) certain instances in which courts *must* grant relief from final judgments if they make particular findings—for example, a finding that a member of the jury accepted a bribe from the prevailing party. The Court, therefore, must mean to hold that Congress may not *unconditionally* require an Article III court to set aside a final judgment. That rule is both unwise and beside the point of this case.

A simple hypothetical example will illustrate the practical failings of the Court's new rule. Suppose Congress, instead of endorsing the new limitations rule fashioned by the Court in *Lampf*, had decided to return to the pre-*Lampf* regime (or perhaps to enact a longer uniform statute). Subsection

(a) of § 27A would simply have provided that the law in effect prior to June 19, 1991, would govern the timeliness of all 10b–5 actions. In that event, subsection (b) would still have been necessary to remedy the injustice caused by this Court's failure to exempt pending cases from its new rule. In my judgment, the statutory correction of the inequitable flaw in *Lampf* would be appropriate remedial legislation whether or not Congress had endorsed that decision's substantive limitations rule. The Court, unfortunately, appears equally consistent: Even though the class of dismissed 10b–5 plaintiffs in my hypothetical would have been subject to the same substantive rule as all other 10b–5 plaintiffs, the Court's reasoning would still reject subsection (b) as an impermissible exercise of "judicial" power.

The majority's rigid holding unnecessarily hinders the Government from addressing difficult issues that inevitably arise in a complex society. This Court, for example, lacks power to enlarge the time for filing petitions for certiorari in a civil case after 90 days from the entry of final judgment, no matter how strong the equities. See 28 U. S. C. § 2101(c). If an Act of God, such as a flood or an earthquake, sufficiently disrupted communications in a particular area to preclude filing for several days, the majority's reasoning would appear to bar Congress from addressing the resulting inequity. If Congress passed remedial legislation that retroactively granted movants from the disaster area extra time to file petitions or motions for extensions of time to file, today's holding presumably would compel us to strike down the legislation as an attack on the finality of judgments. Such a ruling, like today's holding, would gravely undermine federal courts' traditional power "to set aside a judgment whose enforcement would work inequity." *Ante,* at 234.[16]

---

[16] The Court also appears to bar retroactive application of changes in the criminal law. Its reasoning suggests that, for example, should Congress one day choose to abolish the federal death penalty, the new statute

Even if the rule the Court announces today were sound, it would not control the case before us. In order to obtain the benefit of §27A, petitioners had to file a timely motion and persuade the District Court they had timely filed their complaint under pre-*Lampf* law. In the judgment of the District Court, petitioners satisfied those conditions. Congress reasonably could have assumed, indeed must have expected, that some movants under §27A(b) would fail to do so. The presence of an important condition that the District Court must find a movant to have satisfied before it may reopen a judgment distinguishes §27A from the unconditional congressional directives the Court appears to forbid.

Moreover, unlike the colonial legislative commands on which the Court bases its holding, §27A directed action not in "a civil case," *ante*, at 223 (discussing *Calder* v. *Bull*, 3 Dall. 386 (1798)), but in a large category of civil cases.[17] The Court declares that a legislative direction to reopen a class of 40 cases is 40 times as bad as a direction to reopen a single final judgment because "*power* is the object of the separation-of-powers prohibition." See *ante*, at 228. This self-evident observation might be salient if §27A(b) unconditionally commanded courts to reopen judgments even absent findings that the complaints were timely under pre-*Lampf* law. But Congress did not decide—and could not know how any court would decide—the timeliness issue in any particu-

---

could not constitutionally save a death row inmate from execution if his conviction had become final before the statute was passed.

[17] At the time Congress was considering the bill that became §27A, a House Subcommittee reported that *Lampf* had resulted in the dismissal of 15 cases, involving thousands of plaintiffs in every State (of whom over 32,000 had been identified) and claims totaling over $692.25 million. In addition, motions to dismiss based on *Lampf* were then pending in 17 cases involving thousands of plaintiffs in every State and claims totaling over $4.578 billion. Hearing on H. R. 3185, before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, 102d Cong., 1st Sess., 1–4 (1991).

lar case in the affected category. Congress, therefore, had no way to identify which particular plaintiffs would benefit from § 27A. It merely enacted a law that applied a substantive rule to a class of litigants, specified a procedure for invoking the rule, and left particular outcomes to individualized judicial determinations—a classic exercise of legislative power.

"All we seek," affirmed a sponsor of § 27A, "is to give the victims [of securities fraud] a fair day in court."[18] A statute, such as § 27A, that removes an unanticipated and unjust impediment to adjudication of a large class of claims on their merits poses no danger of "aggrandizement or encroachment." *Mistretta*, 488 U. S., at 382.[19] This is particularly true for § 27A in light of Congress' historic primacy over statutes of limitations.[20] The statute contains several checks against the danger of congressional overreaching. The Court in *Lampf* undertook a legislative function. Essentially, it supplied a statute of limitations for 10b–5 ac-

---

[18] 137 Cong. Rec. S18624 (Nov. 27, 1991) (statement of Sen. Bryan).

[19] Today's decision creates a new irony of judicial legislation. A challenge to the constitutionality of § 27A(a) could not turn on the sanctity of final judgments. Section 27A(a) benefits litigants who had filed appeals that *Lampf* rendered frivolous; petitioners and other law-abiding litigants whose claims *Lampf* rendered untimely had acquiesced in the dismissal of their actions. By striking down § 27A(b) on a ground that would leave § 27A(a) intact, the Court indulges litigants who protracted proceedings but shuts the courthouse door to litigants who proceeded with diligence and respect for the *Lampf* judgment.

[20] "Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. . . . They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. . . . [T]he history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control." *Chase Securities Corp.* v. *Donaldson*, 325 U. S. 304, 314 (1945) (Jackson, J.) (footnote and citation omitted).

tions. The Court, however, failed to adopt the transition rules that ordinarily attend alterations shortening the time to sue. Congress, in § 27A, has supplied those rules. The statute reflects the ability of two coequal branches to cooperate in providing for the impartial application of legal rules to particular disputes. The Court's mistrust of such cooperation ill serves the separation of powers.[21]

## IV

The Court has drawn the wrong lesson from the Framers' disapproval of colonial legislatures' appellate review of judicial decisions. The Framers rejected that practice, not out of a mechanistic solicitude for "final judgments," but because they believed the impartial application of rules of law, rather

[21] Although I agree with JUSTICE BREYER's general approach to the separation-of-powers issue, I believe he gives insufficient weight to two important features of § 27A. First, he fails to recognize that the statute restored a pre-existing rule of law in order to remedy the manifest injustice produced by the Court's retroactive application of *Lampf*. The only "'substantial deprivation'" Congress imposed on defendants was that properly filed lawsuits proceed to decisions on the merits. Cf. *ante*, at 242 (BREYER, J., concurring in judgment) (quoting *INS* v. *Chadha*, 462 U. S. 919, 962 (1983) (Powell, J., concurring in judgment)). Second, he understates the class of defendants burdened by § 27A: He finds the statute underinclusive because it provided no remedy for potential plaintiffs who may have failed to file timely actions in reliance on pre-*Lampf* limitations law, but he denies the importance of § 27A(a), which provided a remedy for plaintiffs who appealed dismissals after *Lampf*. See *ante*, at 243–244 (BREYER, J., concurring in judgment). The coverage of § 27A is coextensive with the retroactive application of the general rule announced in *Lampf*. If Congress had enacted a statute providing that the *Lampf* rule should apply to all cases filed after the statute's effective date and that the pre-*Lampf* rule should apply to all cases filed before that date, JUSTICE BREYER could not reasonably condemn the statute as special legislation. The only difference between such a statute and § 27A is that § 27A covered all cases pending on the date of *Lampf*—June 20, 1991— rather than on the effective date of the statute—December 19, 1991. In my opinion, § 27A has sufficient generality to avoid the characteristics of a bill of attainder.

than the will of the majority, must govern the disposition of individual cases and controversies. Any legislative interference in the adjudication of the merits of a particular case carries the risk that political power will supplant even-handed justice, whether the interference occurs before or after the entry of final judgment. Cf. *United States* v. *Klein*, 13 Wall. 128 (1872); *Hayburn's Case*, 2 Dall. 409 (1792). Section 27A(b) neither commands the reinstatement of any particular case nor directs any result on the merits. Congress recently granted a special benefit to a single litigant in a pending civil rights case, but the Court saw no need even to grant certiorari to review that disturbing legislative favor.[22] In an ironic counterpoint, the Court today places a higher priority on protecting the Republic from the restoration to a large class of litigants of the opportunity to have Article III courts resolve the merits of their claims.

"We must remember that the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex.* v. *Pinson*, 282 U. S. 499, 501 (1931) (Holmes, J.). The three branches must cooperate in order to govern. We should regard favorably, rather than with suspicious hostility, legislation that enables the judiciary to overcome impediments to the performance of its mission of administering justice impartially, even when, as here, this Court has created the impediment.[23] Rigid rules often make good law, but judgments in areas such as the review of potential conflicts among the three coequal branches of the

---

[22] See *Atonio* v. *Wards Cove Packing Co.*, 513 U. S. 809 (1994); see also *Landgraf*, 511 U. S., at 258 ("The parties agree that § 402(b) [of the Civil Rights Act of 1991] was intended to exempt a single disparate-impact lawsuit against the Wards Cove Packing Company").

[23] Of course, neither the majority nor I would alter its analysis had Congress, rather than the Court, enacted the *Lampf* rule without any exemption for pending cases, then later tried to remedy such unfairness by enacting § 27A. Thus, the Court's attribution of § 27A to "the legislature's genuine conviction (supported by all the law professors in the land) that *[Lampf]* was wrong," *ante*, at 228, is quite beside the point.

Federal Government partake of art as well as science. That is why we have so often reiterated the insight of Justice Jackson:

> "The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635 (1952) (concurring opinion).

We have the authority to hold that Congress has usurped a judicial prerogative, but even if this case were doubtful I would heed Justice Iredell's admonition in *Calder* v. *Bull,* 3 Dall., at 399, that "the Court will never resort to that authority, but in a clear and urgent case." An appropriate regard for the interdependence of Congress and the judiciary amply supports the conclusion that § 27A(b) reflects constructive legislative cooperation rather than a usurpation of judicial prerogatives.

Accordingly, I respectfully dissent.