Filed 2/23/23  WCST Enterprises v. Ling CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| WCST ENTERPRISES, LLC,<br><br>      Plaintiff and Appellant,<br><br>           v.<br><br>BERIT LING,<br><br>      Defendant and Respondent. | G060377<br><br>(Super. Ct. No. 30-2019-01044486)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Linda S. Marks, Judge.  Reversed and remanded.

Law Offices of Fred S. Pardes and Fred S. Pardes for Plaintiff and Appellant.

Ascher & Associates, Ralph Ascher and Richard Vergel de Dios for Defendant and Respondent.

\*          \*          \*

WCST Enterprises, LLC (WCST), appeals from an adverse judgment on a dispute with a neighbor, Berit Ling, in a residential condominium complex over the right to use a structure that, by all present appearances, looks like an ordinary two-car garage. Examination of the developer's condominium plan (Plan), the Plan's map (Map or Plan Map), and other homeowners' association (HOA) governing documents (CC&R's) presents a more complicated picture.

Those documents, including the Map in particular, suggest the developer may have intended the two-car garage space that Ling has long used as her own to be separated by an interior partition, wall, painted line, or other divider. Such a division, shown by a draftsman's line drawn in the depiction of the garage on the Map, would create two distinct spaces inside the garage: one space for use by the owner of condominium Unit 38 (WCST), and the other for use by the owner of condominium Unit 39 (Ling)—each with enough room to park a single car on their respective sides of the divided space.

Such an unusual design in which a two-car garage space is shared by two different unit owners appears to be ripe for just the sort of controversy that has erupted between Ling and WCST. As Robert Frost once observed, "Good fences make good neighbors." (Frost (1914) "Mending Wall.") The United States Supreme Court has invoked this wisdom as "profit[able] advice authored by a distinctively American poet." (*Plaut v. Spendthrift Farm, Inc.* (1995) 514 U.S. 211, 240.)

It seems unlikely to conclude the design here was accidental or the result of a draftsman's error because there is another garage immediately adjacent to the disputed garage with the same design. That garage is apparently shared amicably by the owners of condominium Units 36 and 37. WCST and Ling have been unable to reach such an amicable resolution.

Here, we find—regrettably—that further proceedings are necessary and we therefore reverse.

2

*Prologue*

Neither the garage shared by Units 36 and 37, nor the disputed garage, has had—at least in any trial participant's memory—any sort of divider in place to separate the interior of each of those garages into two discrete spaces. Still, the dividing line drawn in both garages that appears on the developer's Map seems to have reflected such an intention. The dividing line is clearly evident in both garages on the Map: in one garage, the line separates the two-car garage space into two sides, one side labeled "36G" and the other "37G." In the disputed garage, the draftsman's line similarly divides that garage's space into two sides: one labeled "38G-a" and the other "39G-a."

The nature and intended meaning of the draftsman's dividing line received little direct scrutiny in the proceedings below. It is unfortunate that the HOA was not a party to the proceedings or otherwise called upon by either party to offer any information it might have contributed bearing on the meaning of the dividing line shown in the developer's Map. The developer appointed the initial HOA board of governors, and the HOA's governing documents empower the board to enforce those documents, and therefore also to interpret them.[1] Accordingly, the HOA might have explained, for example, (1) whether in the history of the complex the dividing line was ever given material form as an actual wall or other partition or divider; (2) why the garage structure was not built or at least has not been maintained in a manner to reflect the line; and (3) whether the garage structure should be upgraded in some fashion in conformity with the dividing line shown on the Map.

Instead of focusing on the draftsman's line, the parties debated whether the space inside the garage belonged to one or the other—or both—in a form of fee

---

[1] The record reflects the trial court was frustrated by the HOA's absence from the proceedings, and understandably so. The court expressed hope that, pending a ruling, "the HOA might be inclined to address the problem, especially since this issue will continue to [a]ffect neighborly relations."

3

ownership of "air space" (WCST's position) or as an "exclusive use common area" (Ling's position).[2]

In January 2021, the trial court issued its initial "Intended Statement of Decision" (Intended Decision), which analyzed the issue under the rubric of fee ownership conveyed by title, including under WCST's grant deed. The court later extended its fee analysis to the developer's original intended conveyance as shown in the Corporation Grant Deed by which Unit 38 was conveyed to its first owner in 1966 and by reference to the developer's sample Grant Deed that the developer included in the CC&R's.

Meanwhile, after "extensive" objections in which the trial court observed that "both parties attempt to re-argue their positions," the court reconsidered its Intended Decision, found that "discrepancies in the Condominium Plan, Corporation Grant Deed, and the CC[&]R's" prevented the conclusion that the garage spaces were "subject to title in fee," and ultimately concluded "that the garage space is an 'exclusive use common area' . . . ." In February 2021, the trial court issued a Tentative Statement of Decision along these lines, which became the court's final decision in favor of Ling, impliedly finding she was entitled to use all of the disputed garage space because WCST's interest in its side of the garage, 38G-a, had somehow been transferred to her.

We cannot agree. We do not rule out the possibility that the trial court's decision in favor of Ling was correct, but as we explain, it is not clear in the Tentative Statement of Decision or as finalized in the ensuing judgment—nor do the parties explain—how WCST's interest in garage space 38G-a within the disputed two-car garage

---

[2] The trial court lamented in its final decision: "The testimony in this case was difficult for the Court to understand primarily because [both] counsel continuously objected and raised arguments that were not germane to the issues, and failed to cooperate which then made the proceeding especially difficult being conducted as a remote trial."

4

was transferred to Ling in compliance with applicable statutory rules in the Davis-Stirling Common Interest Development Act (Civ. Code,[3] § 4000 et seq.; hereafter DSA or Act).

## FACTUAL AND PROCEDURAL BACKGROUND

The Huntington Harbor Corporation began development of the condominium project at issue here by filing its Plan (including the Map) and CC&R's with the recorder's office in 1965. The project is located in Huntington Harbor in the City of Huntington Beach.

Ling purchased property in the complex more than 30 years later in 1998. Her grant deed identifies the property she purchased as Unit 39 and the accompanying garage simply as "39G." The trial court in its Initial Decision observed, in contrast, that "[p]rior to the sale to Ling, and going back to 1966," the original "Corporation Grant Deed" that passed the Unit 39 property to its first owner conveyed an interest *not* in a garage identified as "39G," but in "Garages 39G-A and 39G-B as shown on the [P]lan. (Exhibit 11)."

The Plan Map shows that in addition to the disputed two-car garage space labeled on the Map as "38G-a" and "39G-a" (separated by the draftsman's dividing line), there are two single-car garages in the complex that have "G38" or "G39" in their designations on the Map. One is labeled "38G-b" and the other is labeled "39G-b." These two separate single-car garages are several hundred feet away from Units 38 and 39.

The disputed two-car garage space is much closer. The trial court noted that the disputed garage's location "is directly across from" Units 38 and 39, and therefore "easily accessible . . . for parking cars, dropping off groceries, and would be the next best thing to having an attached garage."

---

[3] All further undesignated statutory references are to the Civil Code.

Units 38 and 39 are adjoining two-story residences that along with several other units in the same building form a row of condominiums. Units 36 and 37 are in that same row of adjoining units and, as previously noted, the Plan Map shows they share what looks to be a two-car garage. Units 36 and 37 are smaller than Units 38 and 39 and are allocated only one garage parking space each, which may explain why the garage they share is labeled on the Map with "36G" and "37G," whereas the garage next to it bears the labels "38G-a" and "39G-a." In other words, Units 36 and 37 come with only one parking space each, thereby obviating the "-a" and "-b" subdesignations that may have been deemed necessary for units with two parking spaces in separate garages.

About 20 years after Ling purchased her unit, but before WCST came on the scene, the owners in her row of condominium units discovered discrepancies between the garages identified as theirs in their deeds and the ones they were actually using. WCST's predecessor in interest in Unit 38 was Robert Russell. The trial court in its Tentative Statement of Decision recounted what happened next: "Apparently, Mr. Russell had access [to] and was using Garage spaces G36 and G37. The dispute over the Unit 38/39 garage arose when a neighbor while reviewing his grant deed discovered that he was improperly using his space instead of garage space G37 as identified in his deed. This information was shared with another neighbor whose deed reflected G36. Mr. Russell voluntarily vacated G36 and G37, and started using single car garage space 38G-B (which is identified in his deed), and 39G-B (Ling's second single car garage space) neither of which are located near Unit 38." Further, "Russell['s] . . . grant deed (Exhibit 9-17) identifies Garage 38GA-B" as his.

Ling acknowledged Russell spoke to her "more than once" about his belief that garage space 38G-a in "her" two-car garage belonged to him. Soon after his fruitless conversations with Ling, Russell sold Unit 38 to WCST. The trial court's Tentative Statement of Decision reflects these subsequent events: "WCST purchased Unit 38 in June of 2018 through its principal, Mr. Loomis (Loomis) as a primary residence for

6

Loomis and his wife. Ling purchased her condominium in 1998. At the time Unit 38 was purchased, it was disclosed to WCST that Unit 39 had been in possession of a two-car garage located across the driveway from the Units." Loomis formed WCST to hold title to the condominium; it had no separate business function or operations.

The trial court's Tentative Statement of Decision summarized how Unit 38 was transferred to WCST: "Mr. Loomis testified that rather than get into a dispute with Ling over which garage spaces should be used as identified in the deeds, Russell did not seek to challenge the parking arrangement. At the time Mr. Russell sold his property to WCST, it was disclosed in escrow papers that the garage space issue needed to be resolved. So, WCST at the time of sale was fully aware that litigation to quiet title to the garage space might be required. In fact, WCST's broker deposited $10,000.00 into escrow at the time of sale in the event litigation was required to resolve the dispute."

The trial court's summary of the events leading up to the litigation recounted that "Ling believes her deed entitles her to exclusive use of garage space 39G. One may wonder why WCST would purchase property with the knowledge of impending litigation. Loomis testified that he wanted waterfront property at an affordable price which in this case is a million plus dollars. Unit 38 comes with wharfage, and a convenient boat dock allowing Mr. Loomis to have waterfront property at what he deemed an affordable price in spite of potential litigation."

As the trial court noted, Ling and Loomis "were unable to come to any agreement regarding a shared use of the garage," and, indeed, "the relationship between the parties has been strained from day one."

After an exchange of attorney letters failed to resolve their differences, WCST filed suit in January 2019. Its first amended complaint alleged causes of actions against Ling for (1) ejectment, (2) quiet title, (3) violation of the CC&R's, and (4) trespass. The trial court granted Ling's motion to strike the trespass claim and,

7

following the trial, denied plaintiff's motion to amend the complaint with facts presented at trial said to support that claim.

Dr. Ling quitclaimed his interest in Unit 39 to his wife in 1998, but she "relie[d] primarily on [him] in dealing with the garage space" issue. As such, while the trial court found her "credible," and she testified to her use of the garage for over 21 years, her evidence was "limited in scope," with the court noting that "no evidence [was] presented to explain how she acquired exclusive use." While Dr. Ling "testified to maintenance, repairs and costs of any improvements to the garage space," which included replacing the garage door twice, the trial court found that "given the occupancy, one would not expect anything less."

The court also found Unit 39 was "not Ling's primary residence"; instead, she lived at a different "permanent residence" in Huntington Beach and, based on the photographs in evidence, she used the disputed garage "for storage."

Loomis testified that "the Homeowners Association has not gotten involved in this dispute," leaving it "to the parties to resolve." The court observed that no evidence was presented to explain "why the condominium complex plan lays out 38G-A and 39G-A as a single two car garage and not two separate structures. There was no testimony from the homeowners' association or any other witness on this issue."

The parties had framed the issue for the court to decide as being whether their property interest in the disputed garage was fee simple or "fee in air space" ownership as WCST maintained, or whether the garage was a type of common area known as "exclusive use common area," as Ling advocated. Under the latter interpretation, the garage was designated for the Lings' exclusive use by the condominium association's governing documents, including the Plan, Map, and CC&R's, rather than being a general common area open to use by their fellow owners.

The trial court did not find the expert Ling called on this issue, over WCST's objection, to be persuasive—at least not in its Intended Decision. The court

8

observed that while Ling had "Mr. Richardson . . . testify [as] an expert in analyzing title documents, CC[&]Rs, and condominiums plans," the court found his analysis, as an attorney, to be "more of an advocate" than as an "expert witness of behalf of defendant."

The court referenced the DSA in its Intended Decision and found the Act, as interpreted by Richardson, including its definition of exclusive use common areas, "not really applicable to this condominium plan." While Richardson "testified the garage space was a common area within the complex," the court found "that is controverted by the grant deeds, condominium plan, and deeds of title to the properties." The court also observed that, "[b]ased on the evidence presented at trial, it is not the homeowners association that is responsible for maintaining the garage, but the Unit owner." The court concluded that "discrepancies in the Condominium Plan, CCRs and deeds are not as inconsistent as Mr. Richardson led the Court to believe" and that, ultimately, it "d[id] not believe his analysis was helpful."

Throughout its Intended Decision, the court noted the central "challenge in this case . . . is that there is one structure which is to be shared by two homeowners." The court expressed hope that, "with this ruling, the association might be of some assistance in guiding the parties on how this space might be shared in an attempt to encourage a more positive relationship [than] the one that has developed between the parties." Nevertheless, the court recognized that the matter had been "very contentious from the onset," with the parties "feuding" since 2018, such that, "[r]egardless of the outcome of the case, the relationship between the parties will be strained, and fraught with peril."

The parties each filed extensive objections to the trial court's Intended Decision, and the court did not adopt it as its statement of decision. Instead, the court issued its Tentative Statement of Decision (Decision), which ultimately ripened into the court's final decision in the matter.

The court explained in its Decision that while it "initially took the position that the legal analysis starts with the WCST grant deed," it "revised that analysis," and

9

determined the starting point should be the original Corporation Grant Deed that stated, for each unit, "the property interest conveyed at the inception of the common interest development." The court found that in the Corporation Grant Deed for Unit 38, as would be true of Unit 39, "[t]here is no mention of fee simple or fee simple in air space," which WCST insisted were the controlling concepts. The court acknowledged "that there is language in the Condo Plan of 'fee in air space' and 'appurtenant' to describe the 'Garage Areas,'" but, relying on Richardson's testimony, found that use of "appurtenant" in conjunction with "fee" language "can lead to confusing arguments as to ownership."

The court observed that while Richardson, as an attorney, "appeared at times to be more of an advocate," he nevertheless "did attempt to provide testimony interpreting the various documents and discussing the Davis St[i]rling Act which applies to condominium complexes." As in its Intended Decision, the court again expressed frustration with the way the case was litigated, this time noting that Richardson "tried to address the [Act], Condominium Map, CCR's and title documents, but his testimony was continuously interrupted by Plaintiff's counsel." The court relied on Richardson's testimony that, as the court summarized, "there was an error in the Condominium Plan in which there is a single garage appurtenant to two different owners."

Richardson testified that there were three "errors" in the Plan. "The first and most glaring error" in the Plan, according to Richardson, "is that the description of the garage in the condominium plan in the same phrase refers to the interest [in the garage] as a fee interest and then says it is appurtenant to a stated unit. Those two terms ['fee interest' and 'appurtenant'] are different concepts."

Richardson testified "[t]he second error is a little bit harder to note. But, ordinarily, . . . in a condominium plan, if you're trying to designate a separate interest in airspace, as is asserted by the plaintiff in this case, you state the boundaries of the airspace; the top, the sides, and the bottom. [Thus, t]he classic [written] definition in

10

condominium plans or subdivision maps for condominiums is [']the unfinished surfaces of floors, walls, ceilings, doors, and windows.[']"

Richardson found no such definitions here. "In this instance, [however,] if you look closely at the condominium plan language, you will nowhere see a [written] description of the airspace block for the garage, which is alleged by the plaintiff to have two different blocks of airspace within it. Those blocks of airspace are not described [with a written specification of boundaries; instead, just the draftsman's dividing line]. So that is a very large omission if one is going to try to interpret the garage as two blocks of airspace, each of which are separate interests."

Richardson then addressed what he regarded as a third error: "I guess I would call it maybe an engineering error or a developer's error. And that is simply the indication [by the Map drawing presumably] of a single garage with a single door and a single cabinetry [across the back wall] and no partition within it [he doesn't address the draftsman's line] that is appurtenant to two different owners. That's just a mistake."

Based on Richardson's testimony, the trial court looked to the DSA's comprehensive provisions governing common interest developments, including its recognition of "exclusive use common areas" as set out in section 4145. Under that section, as described by the court, "certain portions of the common area may be reserved for the exclusive use of a particular owner." The reservation may be "for the exclusive use of one or more, but fewer than all, of the owners of the separate interests" in the development. (§ 4145, subd. (a).) The reserved "exclusive use common area" must be "designated by the declaration," i.e., the Plan and CC&R's containing the legal description and restrictions for the development (*ibid.,* see §§ 4135, 4250). The designation must be for the use of those one or more separate interest owners and "is or will be appurtenant to the separate interest or interests" held by those owners. (§ 4145, subd. (a).) The court's Decision concluded "[a]fter reviewing the Condo Plan, CC&R's

11

and Corporation Grant Deed . . . that the garage space is an 'exclusive use common area' consistent with *Civil Code* §4145."

The court added this observation: "It should also be noted that nothing prohibits the transfer of exclusive use areas, independent of any other interest in a common interest subdivision, if authorization to separately transfer exclusive use areas is expressly stated in the declaration and the transfer occurs in accordance with the terms of the declaration. See *Civil Code § 4645*."

While it is not clear, it appears the trial court found, relying on Richardson, that because the DSA recognizes that exclusive-use common areas *may* be transferable (§ 4645 [such areas transferable if so authorized by the development's governing documents]), that is what occurred here. The court's Decision does not say explicitly that such a transfer of space 38G-a was authorized by the Plan or CC&R's, or that such a transfer was the means by which WCST lost its exclusive-use common area interest on the 38G-a side of the draftsman's dividing line in the disputed garage. Instead, the decision stated that "the evidence supports a finding that Mr. Russell, plaintiff's predecessor[,] had *voluntarily relinquished* his use of garage space 38G-A, since he was using spaces 38G-B and 39G-B *which is what he transferred to WCST upon sale of Unit 38*." (Italics added.)

The court did not find that the HOA had recognized this transfer or that any transfer had been accomplished by means set out in the development's governing documents (§ 4645). The court suggested, however, that the HOA might be able to remedy the situation. The court's decision posed and answered the following question: "So, if the Court has concluded that the interest in the garage space is an exclusive[-use] common interest, does WCST have any interest it can assert based on the Condominium Plan which identifies garage space 38G-A [as] tethered to Unit 38? The answer is maybe."

12

The court summarized WCST's potential remedy: "There is an error in the Condo Plan in that the single [disputed two-car] garage is to be shared by two owners." "It would make sense that a garage located near Unit 38 would be allocated to that Unit for convenience sake. However, it would be up to the HOA to remedy this defect, and undertake a revision of the Condo Plan or renovate the garage structure to comport with the Condo Plan."

The court did not conclude Ling had gained a permanent, transferable interest in garage space 38G-a, whether viewed in terms of a fee interest or as an exclusive use common area that was now for her sole use. The court's Decision states that she could continue to "occupy the space" and that "Ling will continue to use the garage space *until* she moves or transfers her interest when selling her Unit." (Italics added.) The court underscored the nature of its dilemma: "The challenge in this case as previously mentioned is that there is one structure to be shared by two homeowners."

The court ended its ruling with this: "In conclusion, the Court finds that the garage spaces within the condominium complex are 'exclusive common areas.' Contrary to the deeds, no ownership or fee interest exists in Garage space 38G-A or 39G-A. Ling has occupied the space for over 20 years. She most likely will continue to occupy the space until such time as she sells or transfers her separate interest in Unit 39, or the HOA as a governing body changes or amends the condominium plan."

The court concluded by awarding judgment "in favor of Defendant against Plaintiff," which became the court's final statement of decision upon which it entered judgment. WCST now appeals.

## DISCUSSION

WCST challenges the judgment on a host of grounds. It contends the court "failed to follow the standard rules of deed and contract interpretation," and that the controlling "Written Instruments demonstrate[] Loomis' right to use garage space

13

38G(a)."  WCST argues, "The Plan refers to fee ownership of garage air space"; "The Declaration [i.e., the CC&R's] excludes garages from common areas"; and the various grant deeds—whether the developer's suggested/sample grant deed in the CC&R's, WCST's actual grant deed, or the original corporate grant deed to Unit 38's first owner—all show an intent "to convey 38G(a) to the owner of Unit 38."

Next, WCST argues the court erred in concluding the garages are exclusive use common areas because it "improperly adopted the expert testimony of Kelly Richardson," whom WCST challenged as not properly designated as an expert because he intruded on the court's sole responsibility to interpret written documents.  WCST also argues among other claims that the court improperly applied the DSA.

Finally, WCST argues in the alternative that "even if the garage is an 'exclusive use common area,' it is Loomis who is entitled to exclusive use of space 38G(A)."  (Capital lettering adjusted.)  Similarly, if the disputed garage is considered an exclusive-use common area for one or more unit owners, but not all, WCST contends that nothing in the final decision sufficiently explains "why Ling has superior rights to 38g(a) over those of Loomis."

We agree with the third contention.  In other words, we agree with the trial court when it correctly cut to the heart of the matter in its Intended Decision by finding as to the disputed garage that, "whether it is an exclusive[-use] common interest or a fee simple interest, Plaintiff *and* Defendant are entitled to the shared use of the two-car garage space identified as 38G-A and 39G-A."  (Italics added.)  That is, "regardless" of whether their respective interests in the garage are as condominium "tenants in common or [in] fee simple ownership, . . . Unit 39 is **not** entitled to the exclusive use of the two car garage space."  (Original boldface.)

We caution that we make this determination in the context of WCST's specific appellate challenge, namely that the final statement of decision does not "set forth a specific legal and factual analysis" adequate to confer on Ling's "superior rights

14

to 38g(a) over those of Loomis." We do not hold that the trial court *cannot* make that determination on a more clearly articulated basis of facts or supporting law. We reverse and remand the matter for proceedings consistent with this opinion.

The standard of review is well settled. Where, as here, the trial court's statement of decision contains both findings of fact and express or implied conclusions of law, we review the findings of fact for substantial evidence. (*Westfour Corp. v. California First Bank* (1992) 3 Cal.App.4th 1554, 1558.) "To the extent the trial court drew conclusions of law based upon its findings of fact, we review those conclusions of law de novo." (*Ibid.*)

WCST made much of the fact that the Huntington Harbor complex's governing documents do not explicitly reference the term "exclusive use common area," but that is understandable given that the project predated the Act. The trial court could find the concept embraced in the CC&R's' reference to "reserved" areas, which notably include "garages and patios" in the project that were "granted *or reserved*." (Italics added.) In fact, presumably relying on Richardson's testimony, the court noted that exclusive use common areas "are sometimes called 'restricted common areas' in project documents," and that appears to be similar to what was intended by the "reserved" term in the CC&R's.

The DSA is not silent on transfer of exclusive use common areas. Section 4645 provides: "Nothing in this article prohibits the transfer of exclusive use areas, independent of any other interest in a common interest subdivision, *if authorization to separately transfer exclusive use areas is expressly stated in the declaration and the transfer occurs in accordance with the terms of the declaration*." (Italics added.)

This provision by its terms indicates that exclusive use areas that are appurtenant to a particular unit may be severed as a separate interest from that unit and attached or allocated to another unit or otherwise be transferred from the original unit.

To do so, however, authorization for such "separate[] transfer" of an exclusive use area or areas *must be* "expressly stated in the declaration" *and* the transfer must "occur[] in accordance with the terms of the declaration." (§ 4645.) These requirements prevent us from upholding the trial court's ruling. We do not see anywhere in the CC&R's either authorization for the "transfer" of an exclusive use interest "independent of any other interest." (*Ibid.*) Nor do we see in the record evidence that transfer to Ling of Unit 38's interest in the area marked 38G-a, assuming arguendo it was a transferable exclusive use common area interest, "occur[red] in accordance with the terms of the declaration." (*Ibid.*) The parties fail to even address these issues. Remand is therefore necessary for the question to be resolved in the first instance.

*Epilogue*

As a regrettable but necessary epilogue to this opinion, we are compelled to observe that the parties and the lawyers in this case have made it far more difficult to resolve than it should have been. It must have been a frustrating case for the trial court to preside over remotely, when a seemingly straightforward garage issue became very complicated factually and legally—at least in the manner it was presented to the court.

A bad situation was made worse by difficult, continuously interjecting lawyers who raised arguments that were not germane to the issues and failed to cooperate. These difficulties were compounded by difficult clients who made it clear they have no intention of sharing the disputed space and who had to be reprimanded by the trial court for making facial expressions into the camera and interfering with the orderly presentation of the cause.

Under these circumstances, and because we cannot say at this time as a matter of law that the trial court cannot set forth sufficient findings of fact and law to support its decision—if it is convinced that is the correct result—we specify that we

16

intend nothing in our recitation of the facts or law to preclude the court from doing so. The trial court is free on remand to revisit its factual and legal findings on a blank slate.

## DISPOSITION

The judgment is reversed, and the matter is remanded for proceedings not inconsistent with this opinion. Appellant is entitled to its costs on appeal.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


MOTOIKE, J.

17